EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**

**Case No. 1:25-cv-00230**

| | |
|---|---|
| DOUGLAS S. RIORDAN,<br><br>Plaintiff,<br>v.<br><br>VPC BUILDERS, LLC;<br>TIMOTHY A. CHURCH d/b/a<br>TIMOTHY CHURCH MASONRY;<br>PRICE FRAMING AND<br>CONSTRUCTION, LLC;<br>WATAUGA VALLEY SERVICES,<br>LLC; A FLOORING OUTLET, INC.;<br>and ARETÉ ENGINEERS, PLLC,<br><br>Defendants. | **JURY TRIAL DEMANDED** |

**FIRST AMENDED COMPLAINT AND**
**REQUEST FOR DECLARATORY RELIEF**

Plaintiff Douglas S. Riordan, ("Mr. Riordan" or "Plaintiff") complaining of the acts of Defendant VPC Builders, LLC ("VPC"), Defendant Areté Engineers, PLLC ("Areté"), Defendant Timothy A. Church d/b/a Timothy Church Masonry ("Church"), Price Framing and Construction, LLC ("Price") Watauga Valley Services, LLC ("WVS") and A Flooring Outlet, Inc. ("AFO") (collectively, "Defendants"), files this civil action pursuant to Rule 57 of the Federal Rules of Civil Procedure and the Federal Declaratory Judgment Act,

28 U.S.C. § 2201 *et seq.,* and in support of its complaint and request for declaratory judgment respectfully shows this Court as follows:

**PARTIES, JURISDICTION, and VENUE**

1. Plaintiff, Douglas S. Riordan, is currently domiciled in Florida. His primary residence and his business are located in Florida. Mr. Riordan is over the age of 18, is not on active military duty, and is otherwise *sui juris*. Plaintiff is a citizen of Florida for purposes of diversity jurisdiction.

2. Defendant, VPC Builders, LLC, is a North Carolina limited liability company, duly organized and existing under the laws of the State of North Carolina with its principal place of business in Banner Elk, Avery County, North Carolina. Upon information and belief, Matthew T. Vincent is VPC Builders, LLC's sole member and is a citizen of North Carolina. Accordingly, VPC Builders, LLC is a citizen of North Carolina for purposes of diversity jurisdiction.

3. Defendant Areté Engineers, PLLC, is a North Carolina professional limited liability company with its principal place of business in Blowing Rock, Watauga County, North Carolina. Upon information and belief, Terry Shawn Ausel is Areté's sole member and is a citizen of North Carolina. Accordingly, Areté is a citizen of North Carolina for purposes of diversity jurisdiction. Areté was retained by VPC to provide structural engineering on

the project and, at all relevant times, acted as an engineer and design professional for the residence located at 3916 Shulls Mills Road, Boone, Watauga County, North Carolina.

4. Upon information and belief, Defendant Timothy A. Church is a citizen and resident of Trade, Johnson County, Tennessee and, at all relevant times, was doing business as Timothy Church Masonry with its principal place of business in Sugar Grove, Watauga County, North Carolina. Church was retained by VPC to provide stonework and masonry work on the project. Timothy A. Church is a citizen of Tennessee for purposes of diversity jurisdiction.

5. Upon information and belief, Price Framing and Construction, LLC is a limited liability company with its principal place of business in Laurinburg, Scotland County, North Carolina. Upon information and belief, Zackery Alan Price, Sr. is the sole member of Price Framing and Construction, LLC and is a citizen of North Carolina for purposes of diversity jurisdiction. Accordingly, Price Framing and Construction, LLC is a citizen of North Carolina for purposes of diversity jurisdiction. Price was retained by VPC to provide framing and siding installation on the project.

6. Upon information and belief, Watauga Valley Services, LLC, is a Tennessee limited liability company with its principal place of business in

Johnson City, Tennessee. Upon information and belief, Jared Blake Taylor is Watauga Valley Services, LLC's sole member and is a citizen of Tennessee. Accordingly, Watauga Valley Services, LLC, is a citizen of Tennessee for purposes of diversity jurisdiction. WVS was retained by VPC to provide labor and materials used to pour the concrete slab for the project.

7. Upon information and belief, A Flooring Outlet, Inc., is a North Carolina corporation, duly organized and existing under the laws of the State of North Carolina with its principal place of business in Banner Elk, North Carolina. Accordingly, A Flooring Outlet, Inc. is a citizen of North Carolina for purposes of diversity jurisdiction. AFO was retained by VPC to provide wood flooring installation on the project.

8. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1), which confers original jurisdiction where the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different States. The amount in controversy exceeds $75,000. Complete diversity exists because Plaintiff is a citizen of Florida; VPC Builders, LLC, Price Framing and Construction, LLC, A Flooring Outlet, Inc., and Areté Engineers, PLLC are citizens of North Carolina; and Watauga Valley Services, LLC and Timothy Church are citizens of Tennessee.

9. This Court has the authority to award the requested declaratory relief under 28 U.S.C. §§ 2201-02 and Federal Rule of Civil Procedure 57.

10. This Court has personal jurisdiction over the parties. VPC, Price, AFO and Areté are North Carolina entities. Church regularly conducted business in North Carolina and performed masonry and stonework on the project in Watauga County, North Carolina. WVS regularly conducted business in North Carolina and performed concrete flooring work on the project in Watauga County, North Carolina. Each Defendant purposefully directed its work and services to North Carolina, and the claims alleged below arise from that work and those services.

11. The Declaratory Judgment Act confers jurisdiction on this Court to:

> declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.
>
> 28 U.S.C. § 2201(a).

12. The amount in controversy in this case exceeds the sum of $75,000.

13. Venue is appropriate in this District Court pursuant to 28 U.S.C. § 1391(b)(2) because all the events and omissions giving rise to the claims alleged below occurred in this District.

## INTRODUCTION

14. This action arises from two contracts entered between Douglas and Erin Riordan[1] and VPC Builders, LLC, including 1) a design contract for plans and specifications for the construction of a residence, and 2) a cost-plus construction contract. VPC was the design-builder for this project.

15. Mr. and Mrs. Riordan chose VPC to design and build a second home in the mountains of western North Carolina, believing VPC to be a diligent, experienced, and competent general contractor. Despite a relatively straightforward project that should have been designed and completed within 2-3 years, VPC's lack of project coordination or attention to detail caused construction defects, code violations, design errors, substantial delays, increased costs, and damage to completed work and Plaintiff's property. Additionally, VPC engaged in a pattern of improper and unsubstantiated billing. When Mr. Riordan questioned certain invoices of VPC's and requested supporting documentation, VPC stopped work, claiming it had the right to do so. Mr. Riordan, on the other hand, does not believe that VPC, having

[1] Although Mrs. Riordan's name appears on the contracts, because of significant health issues including recent brain surgery, she is physically and mentally unable to participate in this case as a plaintiff. Moreover, Mrs. Riordan executed an Assignment of Rights effective July 24, 2025, assigning all her right, title, and interest in the VPC design, construction, and interior-design contracts, including all related claims and rights of recovery, to Mr. Riordan. *See* **Exhibit F**. Her involvement in the underlying project, in any case, was minimal to non-existent.

previously breached the contracts, was entitled to stop work and further delay the project.

16. Since the filing of the original Complaint, Plaintiff's experts have completed additional investigation and analysis of the project. That investigation confirmed that this project contains significant construction defects, code violations, incomplete and non-conforming work, deficient structural design and coordination, defective masonry and stone veneer work, defective building-envelope interfaces, and subcontractor-caused physical injury to tangible components of the residence.

17. Among other subcontractors, VPC retained Areté to provide structural engineering services, retained Church to provide stonework and masonry work, retained Price to provide framing and siding installation, retained WVS for concrete slab installation and retained AFO for wood flooring installation. Areté, Church, Price, WVS and AFO failed to properly perform the work and services for which they were hired.

18. Defendants' substandard work caused resulting damage to and loss of use of completed work and Plaintiff's tangible property including completed wall assemblies, cladding, sheathing, structural framing, concrete slab and wood flooring, roof and deck assemblies, masonry and stone veneer

systems, window and door interfaces, finishes, and related building components.

19. Additionally, correcting the defective work and resulting damage will require the removal, demolition, deconstruction, reconstruction, and replacement of completed building components, including components that were not themselves defectively installed but must be removed or replaced to access and remediate the resulting damage.

## FACTUAL BACKGROUND

### *The Contracts*

20. In or around April 2021, Mr. Riordan chose VPC to design and construct a two-story, single-family dwelling containing 5820 heated square feet located at 3916 Shulls Mills Road, Boone, Watauga County, North Carolina ("Project").

21. Mr. Riordan hired VPC as his design-builder relying on VPC's reputation and expertise as a turnkey contractor in Western North Carolina.

22. Mr. Riordan entered two contracts with VPC, (1) a design contract on or about June 7, 2021 ("Design Agreement"); and (2) a cost-plus construction

contract ("Construction Agreement") on or about April 27, 2022. *See* **<u>Exhibit A</u>**.[2]

23. Pursuant to the Design Agreement, VPC agreed to prepare a custom set of design plans to construct a house, with an initial estimate as stated in Paragraph 1 of the Design Agreement, as follows:

> VPC BUILDERS, LLC agrees to work with the Owner(s), VPC BUILDERS, LLC's design draftsmen, and other individuals to create a set of custom design plans for the intent of construction of a house as the parties may contract and agree to build at a later date. VPC BUILDERS, LLC agrees to assist the Owner(s) in the development and preparation of a structure and agrees to consult with design rural, civil, structural, mechanical, electrical, or other systems as VPC BUILDERS, LLC deems needful or necessary.

24. VPC prepared a construction set of final plans on or around August 12, 2022 ("Plans").

25. Mr. Riordan paid VPC all amounts due under the Design Agreement with the understanding that the Plans VPC had completed were prepared by competent architects and were final, appropriate, and suitable for construction. VPC had taken an inordinate amount of time to complete the Plans and presented them to Plaintiff on August 22, 2022, as the "final" Plans.

26. The Plans include drawings for a two-story slab on grade residential structure with approximately 5,500 heated square feet.

---

[2] The parties also entered an interior design contract on or about August 22, 2022, but that contract is not the subject of this action.

27. On July 25, 2022, near the end of the Plan development, VPC estimated the value of construction at approximately $2,762,585, and the parties entered an Addendum to the Construction Contract containing this amount.

28. The Construction Agreement contains a "time is of the essence" clause requiring Defendant to complete its construction work within specified deadlines after issuance of a building permit. It states:

> **Commencement & Substantial Completion** Work shall commence upon the obtainment of a building permit, or shortly thereafter. Construction time through substantial completion shall be fixed and is TBD months, not including delays and adjustments for delays caused by reason of holiday, inclement weather, accidents, labor or material shortages, additional time required for work performed pursuant change orders, or other unavoidable delays or delays beyond the control of VPC BUILDERS, LLC.

29. Although the Construction Agreement contemplates a "fixed" construction deadline following issuance of the building permit and the agreement itself provides that the number of months is "TBD", the completion dates were later added by VPC to its scheduling software called "Buildertrend." At the time, the parties entered the Construction Agreement, VPC told Mr. Riordan it would take approximately eighteen (18) months, or until December 2023, to complete the construction work.

30. The Construction Agreement also contains provisions requiring VPC to correct defective and non-conforming work at its own expense. The Construction Agreement states that the "Owner may reject work that does not conform to the Contract," and that the "Contractor shall promptly correct work rejected by the Owner as failing to conform to the requirements of the Contract," and that the "Contractor shall bear the costs of correcting such rejected work, including the costs of uncovering, replacement, and additional testing." Construction Agreement ¶20.

31. The fact that VPC assumed the obligation and expense of correcting work including the costs of investigating and testing its work makes it implicit in the Construction Agreement that VPC also bore the concomitant responsibility to segregate its repair work from other non-repair work and to implement accounting control measures to properly track repairs, delays, and schedule acceleration costs.

***VPC's Poor Project Execution, Delays, Defects, and Overbilling***

32. VPC obtained a building permit on September 9, 2022, broke ground on October 6, 2022, and but did not pour footers until February 6, 2023.

33. Beyond this month's long delay, Mr. Riordan began noticing many plan design and construction errors as the work progressed. Such mistakes and resulting delays were likely caused by VPC's frequent turnover in management

personnel and lack of Project oversight, follow-through, and coordination. These errors were contributing to delays and increased construction costs

34. As a result, the Project often languished with little work taking place.

35. Examples of the design and construction errors that unnecessarily delayed the Project and increased costs include, but are not limited to: (a) design and construction defects related to the great room sliding door/window-wall; (b) delays associated with correcting the sliding door/window-wall; (c) design and construction defects relating to framing the interior staircase, and resulting delays; (d) the failure to structurally support the stick-built (*i.e.*, non-manufactured trusses) portion of the roof during construction; (e) Plan defects and knock-on impacts relating to the rear staircase; (f) installing the footers for the rear deck stairs in the wrong location; (g) design and construction defects relating to the dormer roofs (impacting the shed roof and dormer window); (h) the lack of engineered plans generally including in particular for the roof and jacuzzi, a violation of North Carolina's building code; (i) repeated turnover of key project management personnel; and (j) VPC's decision to stop work after breaching the contract in many ways including its significant delays.

36. Design and construction defects were later confirmed and expanded through further investigation and assessment of the Project by experts. Those experts confirmed that the Project contained significant structural, code, building-envelope, masonry, flashing, waterproofing, framing, concrete slab, flooring and cladding defects, as well as resulting physical damage and repair scopes requiring removal and replacement of completed work and other property.

37. VPC's accounting suffered from similar mismanagement and failure to undertake basic control measures. Among other things, VPC:

a. Failed to implement the contractually required processes to segregate its repair and non-repair costs and the additional time necessary to perform repair work and resulting schedule acceleration needed from that work;

b. Failed to account for construction delays;

c. Failed to implement processes to track general conditions charges corresponding to repair work and periods of delay;

d. Charged for all costs to repair defective work and for indirect labor and general conditions charges correlating to that work;

e. Charged indirect labor, supervision, and general conditions for VPC's delays; and

f. Improperly charged a builder's fee on certain invoices, such as interior design services.

38. Mr. Riordan attempted to address these concerns with VPC in verbal and written communications, but to no avail. By way of example only, attached are two emails dated April 26, 2024, and August 2, 2024, from Mr. Riordan to VPC. **See Exhibit B.**

39. On April 26, 2024, Mr. Riordan complained to Matt Vincent, the principal of VPC, regarding the sliding door/window-wall defects and the months-long delay in which the house was exposed to the elements.

40. On August 2, 2024, Mr. Riordan pointed out the ongoing delays and the fact that VPC was well into the third year of its construction on the Project.

41. Often when Mr. Riordan complained, as in these examples, VPC side-stepped accountability for its failures and shifted blame to Mr. Riordan for his supposedly unprofessional and inappropriate behavior towards employees and subcontractors, which was unfounded.

42. Despite the challenges, Mr. Riordan still believed that VPC would act in good faith by accelerating the construction schedule and adhering to its contractual invoicing requirements.

43. Four years into the Project, Mr. Riordan continued to pay VPC's invoices in full and in a timely manner.

44. Nonetheless, VPC charged Mr. Riordan for all costs associated with repairing defective and non-conforming work, and insisted on payment from him, with the threat of stopping work if he refused to do so.

45. One such example is the charges related to correcting the sliding door/window-wall. This defect was the direct result of Plan errors and VPC's unwillingness to accept responsibility for them. VPC created two so-called "change orders", referred to as Change Orders 22 and 32, to recover the costs of re-engineering and repairing the sliding door/window-wall for a total of $51,448, and then insisted on payment. To avoid VPC stopping work and scuttling the Project, Mr. Riordan paid these amounts under protest, while reserving his rights to dispute them later. *See* Ex. B (Aug. 2 email); **Exhibit C** (Change Order #32).

46. Although VPC refused to acknowledge it, mistakes like these delayed the critical path for completion of the Project. All the while, VPC continued charging Riordan for its mistakes and "general conditions" charges with impunity. As later explained by VPC, general conditions charges included all supervisory and management labor.

### *VPC Treats Completion Dates as a Moving Target*

47. VPC's original estimate for completing the Project was December 2023.

48. However, VPC was nowhere near completing its work by this time and changed the completion date on the construction schedule to June 2024.

49. The Project continued to experience more delays and VPC changed the completion date on Buildertrend again to reflect completion in January 2025. Distressed, Mr. Riordan requested a meeting with VPC in or around May 2024.

50. In the May 2024 meeting, VPC agreed to accelerate the construction schedule in exchange for Mr. Riordan's payment of Change Order 32, which work VPC had still not performed. As a result of this meeting, VPC agreed to complete construction by November 2024 and based on those assurances, Mr. Riordan released the disputed sliding door/window wall payment for Change Order 32 while reserving his right to dispute that payment in the future.

51. VPC fell short on its promises and two months after the May 2024 meeting, VPC made no demonstrative progress on the Project or the sliding door/window-wall.

52. After, VPC yet again unilaterally changed the completion date to cover for more of its delays. VPC, realizing that its failure to timely order cabinets would cause another 4-month delay, extended the completion date in Buildertrend by another four months.

53. Again, with VPC's typical hegemony, it sent another change order purporting to extend the schedule another 65 days from April 10, 2025, which would extend Mr. Riordan's completion date to June 2025.

***VPC's Mounting Costs, Unreasonable Delays, and No End in Sight to Overbilling***

54. VPC's work on this Project is now in its *fifth year*. The total cost to complete the Project will exceed approximately $5,000,000. Though approximately $1,900,000 of this increase is related to approved change orders, a large portion of the costs are not.

55. In addition to charging Mr. Riordan for costs to correct defective work, for every month that VPC has delayed the Project, it has invoiced Mr. Riordan approximately $15,000 in "general conditions" charges and indicated its intent to continue doing so without regard for its mistakes, the schedule, or its delays.

56. VPC has implemented no discernible cost control measures to manage construction costs and failed to allocate its repair costs or any indirect labor or general conditions expenses to any particular scope of work. Rather,

despite its specific contractual obligations prohibiting it, VPC invoiced Mr. Riordan every dollar VPC has spent without regard for its mistakes or delays.

57. VPC has also disregarded its contractual obligations by charging for fees that it had no right to charge.

58. Despite obtaining a certificate of occupancy in May 2025, VPC has delayed completing the Project yet again by, among other things, failing to complete the master bath and kitchen cabinetry and failing to properly coordinate its work with the glass and cabinetry subcontractors.

***VPC Stops Work, Breaches Contract, and Termination***

59. In or around April 2025, alarmed by VPC's unsupported and endless invoicing, Mr. Riordan began questioning some of VPC's invoices and general conditions charges. For example, in April 2025, VPC began sending Mr. Riordan invoices containing numerous unallocated general conditions charges as "change orders" without any explanation or backup documentation. Mr. Riordan questioned the invoices and requested an explanation and backup documentation. On or about June 30, 2025, before providing the information requested and while Mr. Riordan was still otherwise current on his account, VPC stopped work. Mr. Riordan disputed VPC's entitlement to stop work and notified VPC that it was in breach of the Construction Agreement. *See* **Exhibit D**.

60. VPC improperly stopped work in a brinksmanship-style effort to force payment and financial concessions from Mr. Riordan at a time when VPC had already delayed the project by many months and when Mr. Riordan and his wife, who was seriously ill, were desperate.

61. On July 7, 2025, after VPC failed to cure, Mr. Riordan gave VPC a more comprehensive summary of VPC's breaches and implored VPC to reconsider its position and work through Mr. Riordan's legitimate questions and concerns. *See* **Exhibit E**.

62. VPC refused to do so.

63. On July 17, 2025, Mr. Riordan terminated all agreements with VPC for cause and later retained other contractors and experts to complete and assess the work in place.

***The Work Deviates from the Contract Requirements, is Defective, Violates the Building Code, and Contains Design Defects***

64. After VPC abandoned the Project, Plaintiff's experts completed further investigation and analysis of Defendants' work. Those materials confirmed additional defects and damages that were not fully known when the original Complaint was filed.

65. VPC performed or caused to be performed substantial portions of the work through subcontractors, such as framing and siding, roofing, exterior cladding, stone veneer and masonry, flashing and waterproofing, window and

door installation, deck construction, insulation, concrete work, flooring, structural design, and related scopes of work.

66. At all times relevant, VPC was responsible for coordinating and supervising the work of its subcontractors and for ensuring that the Project was constructed in accordance with the Contracts, Plans, applicable building codes, manufacturer requirements, industry standards, and good and workmanlike construction practices.

67. VPC retained Areté to provide structural engineering for the Project. Areté's work included, or should have included, the preparation, review, coordination, and approval of structural engineering plans, calculations, details, load paths, point loads, foundation and framing requirements, deck and roof support requirements, and related structural components necessary for a code-compliant residence.

68. Church was retained by VPC to provide stonework and masonry on the Project. Church's work included, or should have included, stone veneer and masonry work performed in compliance with the Plans, applicable building codes, manufacturer requirements, industry standards, required clearances, flashing, weep screeds, WRB integration, drainage requirements, and good and workmanlike construction practices.

69. Price was retained by VPC to provide framing and siding installation on the Project including natural wood siding, bark shingles, and related exterior wall cladding work.

70. WVS was retained by VPC to install the basement concrete slab-on-ground that served as the substrate for the floor covering.

71. AFO was retained by VPC to prep the concrete slab and install the wood floor covering including grinding the slab, installing the floors with ram board, and cutting around tiles and changing out boards.

72. The defects identified by Plaintiff's experts include, without limitation, structural design and load-path defects; inadequate or incomplete engineering; uneven and unlevel basement slab; flooring defects; roof and attic framing defects; defective ridge beam; lateral load, point load, deck joist, deck girder, built-up column, LVL, hanger, taper-cut, and fireblocking defects; sliding window-wall design and construction defects; defective window and door sealant and flashing defects; defective WRB integration; defective exterior cladding and siding; defective stone veneer and masonry work; defective deck attachment and waterproofing; and other defects to be proven through discovery and at trial.

73. VPC did not complete construction of the Project in accordance with the construction documents and did not complete construction in

accordance with applicable building codes, manufacturer requirements, and industry standards.

74. VPC constructed the Project using construction documents prepared under VPC's arrangement with Areté that did not provide the information required to satisfy the 2018 North Carolina Residential Code. Components that did not meet criteria for code-based prescriptive design were constructed without adequate engineered design shown in the construction documents.

75. These structural conditions caused damage to completed work and Plaintiff's tangible property and will require extensive engineering, re-engineering, demolition, reconstruction, and further investigation of structural and non-structural components. The defects also caused loss of use of portions of the residence.

76. The sliding window-wall defect is one example. The sliding window-wall framing at the rear elevation could not be constructed as indicated on the construction documents because it clashed with a structural post. To address this conflict, the wall and related framing were deconstructed, relocated, built out, reconstructed, and re-engineered, causing additional costs, delays, removal and replacement of completed components, and damage to other parts of the Project.

77. Similarly, VPC's improper flashing around the deck bands requires removal and reconstruction of deck components and loss of use of the deck. Inspection of the rear elevation second-floor deck attachment found that the wall covering waterproofing components did not continue behind the deck band board to create a continuous water management system in accordance with applicable building codes and industry standards. Adjacent sections of WRB above and below the deck band were discontinuous and were not weather-lapped; aluminum flashing behind the deck band was not weather-lapped with the WRB as required by applicable codes; the flashing did not kick out below the band; aluminum flashing was used in violation of applicable deck-construction requirements; and the flashing did not extend two inches above the bottom of the siding.

78. The stone veneer and masonry work performed by Church, or by others under VPC's supervision, contained missing or inadequate clearances above earth, paving, horizontal flashing, and other surfaces; missing or inadequate weep screeds; missing or defective WRB integration; missing or defective flashing; and masonry and stone veneer conditions that created building-envelope intersections susceptible to water intrusion, trapped moisture, deterioration, and damage to adjacent building components.

79. Price performed framing and siding work on the Project that is defective including construction of the interior and exterior stairs, decking, roof gables, dormers, foyer gable, flashing around windows, and ridge-to-beam supports.

80. Price also installed the natural wood siding and cladding without nailing strips or blocking required by the applicable building codes, and without observed nailing strips or blocking. In addition, the natural wood siding and bark shingles above horizontal flashing were installed without the clearance required by applicable building codes and industry standards.

81. The above siding, flashing, masonry, and building-envelope defects caused, or created pathways for, water intrusion behind cladding into wall assemblies, premature deterioration, damage to sheathing, and other building components, and resulting loss of use of affected portions of the residence.

82. WVS was hired to pour the basement concrete slab-on-ground that would serve as the substrate for the floor covering. The concrete slab was poured with excessive variations in elevation, exceeding the maximum allowances permitted under the applicable standards. As a result, the slab failed to comply with applicable standards and caused the completed floor assembly to fail to meet the requirements of the applicable building code.

83. AFO installed the wood flooring over the concrete slab despite its excessive undulations, thereby causing the floor to “give” when walked on and compounding the existing defects and contributing to the finished floor's noncompliance with applicable standards and the need for further corrective work.

84. Plaintiff seeks damages including the costs to investigate, test, engineer, remediate, repair, replace, remove, demolish, reconstruct, and complete the Project; costs to repair resulting property damage; costs to remove and replace completed components necessary to access and repair damaged or defective assemblies; loss-of-use damages; delay damages; general conditions and carrying costs caused by Defendants’ acts and omissions; overpayments; and other actual, consequential, compensatory, and economic damages to be proven at trial.

85. Defendants’ acts and omissions described above caused damages in excess of $75,000 and in amounts to be determined at trial

86. All necessary actions have been performed prior to the filing of this lawsuit.

********

**COUNT I – BREACH OF CONTRACT**
**(The Design Agreement – Against VPC)**

87. The allegations of the foregoing paragraphs are incorporated herein by reference.

88. The Design Agreement is a valid and binding agreement.

89. The Plaintiff has fully complied with all covenants, conditions, and obligations required of him under the Design Agreement.

90. The Design Agreement obligated VPC to prepare a set of construction set of plans that contained all the necessary engineering and structural elements for the Project.

91. The Design Agreement also contained an implied duty of good faith and fair dealing.

92. Plaintiff paid all VPC's design invoices in full because VPC had informed Plaintiff and Plaintiff believed that VPC had completed the design process by competent professionals including all the necessary engineering elements.

93. VPC breached the Design Agreement by, among other things,

a. Failing to employ competent design professionals to prepare the Plans;

b. failing to include the necessary and proper engineering elements in the Plans;

c. failing to coordinate Areté's structural engineering work with the architectural, structural, and construction requirements of the Project;

d. failing to ensure that the Plans, structural drawings, and engineering details provided sufficient load paths, point loads, foundation support, lateral load design, roof and deck structural design, and other engineering necessary for code-compliant construction;

e. unreasonably delaying the design process and beginning construction activities before completing the Plans;

f. misrepresenting to Plaintiff that it had completed the Plans and was ready to start construction when the Plans were not ready for construction; and

g. other ways learned during discovery and proven at trial.

94. As a result of VPC's breaches, the Project experienced delays and defective conditions as described in the paragraphs above.

95. As a direct and proximate result of VPC's breaches, Plaintiff also sustained damage to tangible property and resulting loss of use as alleged above, including damage caused by defective design coordination and subcontractor work to completed building components and other property.

96. As a direct and proximate result of VPC's actions, Plaintiff has been harmed in excess of $75,000 and other amounts to be fully determined at trial on the merits.

**COUNT II – BREACH OF IMPLIED DUTY THAT PLANS AND SPECIFICATIONS ARE ADEQUATE, ACCURATE AND COMPLETE (The Design Agreement – Against VPC)**

97. The allegations of the foregoing paragraphs are incorporated herein by reference.

98. In every design contract, there is an implied duty that the plans and specifications are adequate, accurate and complete for the home on which the property is located.

99. VPC breached this duty because the final Plans it provided to Plaintiff were inaccurate and deficient in many ways, including the following:

a. lacking essential engineering analysis and integration including, without limitation, related to the sliding door/window-wall and non-manufactured truss roof sections;

b. contained errors and clashing related to the great room sliding door/ window wall;

c. clashing and errors related to framing the interior staircase;

d. improper design of the rear staircase;

e. placement of the footers for the rear deck stairs in the wrong location;

f. errors relating to the dormer roofs (impacting the shed roof and dormer window);

g. lack of engineering for the jacuzzi;

h. failure to provide adequate structural load paths, point loads, ridge beam design, lateral load design, deck design, roof support, foundation coordination, and other structural requirements necessary to satisfy the 2018 North Carolina Residential Code and applicable standards;

i. failure to coordinate Areté's limited structural drawings with the final Plans and with the as-built construction;

j. failure to provide details sufficient to prevent defective, non-code-compliant, and damaging construction by VPC and its subcontractors; and

k. all correlative delays and knock-on effects related to the above errors.

100. As a result of or in part due to the Plan errors, Defendant constructed defective work, created structural defects, significantly delayed the Project and caused damage to Plaintiff in an amount to be determined at trial.

101. The damages caused by VPC's breach include the cost to investigate, engineer, remediate, repair, remove, replace, and reconstruct defective and damaged work, resulting property damage to completed building components, and loss of use of portions of the residence.

**COUNT III – BREACH OF CONTRACT**
**(The Construction Agreement – Against VPC)**

102. The allegations of the foregoing paragraphs are incorporated herein by reference.

103. The Construction Agreement is a valid and binding agreement.

104. Plaintiff has fully complied with all covenants, conditions, and obligations required of him under the Construction Agreement.

105. As alleged in the paragraphs above and set forth in the Construction Agreement, VPC agreed that time was of the essence in completing the Project and meeting all deadlines provided in the construction schedule.

106. The Construction Agreement also required VPC to correct its defective work at its own expense and to accelerate the schedule based on delays caused by its work.

107. Implicit in the Construction Agreement is the obligation to (1) staff the Project with enough qualified personnel including project managers and site superintendents, and (2) retain, coordinate, supervise, and control

competent subcontractors and design professionals, and to ensure that their work complied with the Plans, applicable codes, manufacturer requirements, industry standards, and good and workmanlike construction practices.

108. VPC breached the Construction Agreement by, among other things:

a. Failing to obtain and maintain adequate project oversight, supervision, and coordination;

b. Failing to properly supervise and coordinate the work of trades and subcontractors;

c. Failing to identify plan errors and defects before starting work;

d. Failing to execute the work in a reasonably diligent manner to meet the Project's schedule;

e. Failing to repair its defective work on its own expense and to accelerate the schedule to recover for corresponding delays;

f. Failing to implement cost control measures or accounting processes to comply with contractual requirements;

g. Failing to adequately support invoices with backup documentation;

h. Charging Plaintiff for costs to correct deficient work and for periods of delay;

i. Failing to construct the Project in accordance with the Construction Agreement, Plans, applicable building codes, manufacturer requirements, and industry standards;

j. Failing to coordinate and supervise Areté, Church, Price, WVS, AFO and other subcontractors and trade contractors;

k. Failing to prevent defective subcontractor and trade work from causing damage to the completed work of others and to Plaintiff's property, and resulting loss of use;

l. Failing to correct or pay for resulting property damage caused by defective work and subcontractor work; and

m. other ways learned during discovery and proven at trial.

109. Under the factual circumstances of this case, VPC also breached its implied duty of good faith and fair dealing.

110. As alleged in the paragraphs above, VPC misrepresented certain facts to placate Plaintiff and receive payment without regard for the truth or accuracy of such assertions and mistreated Plaintiff in such a way that injured the rights of Plaintiff to receive the benefits of the Agreements and deprived Plaintiff of the fruits of its bargain with VPC.

111. As a result of Defendant's actions, Plaintiff has been harmed in amounts to be fully determined at trial on the merits.

**COUNT IV – BREACH OF THE IMPLIED DUTY OF WORKMANLIKE PERFORMANCE (The Construction Agreement – Against VPC)**

112. The allegations of the foregoing paragraphs are incorporated herein by reference.

113. At all times material hereto, Defendant has an implied duty to perform its work in a good and workmanlike manner.

114. North Carolina law recognizes an implied warranty that the general contractor or builder will use the customary level of skill and care on all projects.

115. As alleged in the paragraphs above, VPC did not fulfill its duties to Plaintiff pertaining to industry standards and therefore breached the implied duty of workmanlike performance.

116. VPC also breached the implied duty of workmanlike performance by allowing defective and non-code-compliant structural, framing, deck, roof, siding, flashing, waterproofing, masonry, and other building-envelope work to be installed and remain at the Project.

117. VPC's defective work and its subcontractors' defective work is causing damage to Plaintiff's property, including wall assemblies, cladding,

sheathing, framing, roof and deck assemblies, stone veneer systems, finishes, and related components, and resulting loss of use.

118. In addition, because of VPC's decision to stop work, Plaintiff has not had the opportunity to obtain a final inspection of the dwelling and reserves the right to identify other conditions and defects and to retain necessary funds to remedy such defects, after obtaining a final inspection.

119. As a direct and proximate result of this breach of the implied duty of workmanlike performance, Plaintiff has been damaged in an amount to be determined at trial.

## COUNT V – DECLARATORY JUDGMENT
## (Against VPC)

120. The allegations of the foregoing paragraphs are incorporated herein by reference.

121. This declaratory judgment action is brought pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 & 2202 to declare the rights and obligations of the parties arising from a contract for construction of a private residence.

122. As set forth above, there exists, real and justiciable controversies between Plaintiff and Defendant regarding the parties' respective rights and obligations under the two (2) Agreements entered into by the parties.

123. Pursuant to 28 U.S.C. §§ 2201 & 2202, the Court can resolve the foregoing controversies through Declaratory Judgment.

124. Specifically, Plaintiff requests the court declare:

a. That Defendant VPC engaged in the first breach of the Design and Construction Agreements;

b. Had no right to stop work at the time and under the factual circumstances of this case; and

c. That Plaintiff at all relevant times had substantially complied with his obligations under the Agreements, which required VPC to honor its contractual obligations including complete construction.

**COUNT VI – NEGLIGENCE**
**(Against Church)**

125. The allegations of the foregoing paragraphs are incorporated herein by reference.

126. At all times material hereto, Church was engaged in the business of providing stonework and masonry services for compensation and held himself out as competent to perform such work on residential construction projects in North Carolina.

127. Church owed Plaintiff a duty, independent of any contract between Church and VPC, to perform his stonework and masonry work in a reasonably safe, competent, non-negligent, and workmanlike manner and in compliance

with applicable building codes, manufacturer requirements, industry standards, the Plans, and good construction practices.

128. Church knew or should have known that his stonework and masonry work would be incorporated into Plaintiff's residence and that defective, non-code-compliant, or improperly integrated stonework and masonry would cause or contribute to physical injury to the residence, including wall assemblies, cladding, sheathing, framing, flashing, WRB components, finishes, and other tangible property.

129. Church breached his duties by, among other things:

a. Failing to perform stonework and masonry work in a good and workmanlike manner;

b. Failing to comply with applicable building codes, manufacturer requirements, industry standards, and the Plans;

c. Failing to provide required clearances for adhered stone veneer and masonry above earth, paving, decks, roofs, horizontal flashing, and other surfaces;

d. Failing to properly install, coordinate, or integrate flashing, WRB, drainage components, and weep screeds with the stone veneer and masonry work;

e. Failing to prevent masonry and stone veneer work from creating building-envelope intersections susceptible to water intrusion, trapped moisture, premature deterioration, and damage to adjacent building components;

f. Failing to coordinate his work with VPC and other trades to ensure a continuous water-management system;

g. Failing to correct defective or non-conforming stonework and masonry after the defects existed or should have been known; and

h. Such other and further acts of negligence as shall be shown in discovery or at trial.

130. Church's negligence caused or contributed to physical injury to tangible property, including exterior wall assemblies, cladding, sheathing, framing, flashing, WRB components, finishes, and related components of the residence.

131. Church's negligence also caused resulting loss of use and required or will require investigation, removal, demolition, reconstruction, repair, replacement, and remediation of defective and damaged components, including completed components not themselves defectively installed but necessarily removed or damaged to access and correct the resulting damage.

132. As a direct and proximate result of Church's negligence, Plaintiff has been damaged in an amount to be determined at trial, but in excess of $75,000.

**COUNT VII – BREACH OF THE IMPLIED DUTY OF WORKMANLIKE PERFORMANCE**
**(Against Church)**

133. The allegations of the foregoing paragraphs are incorporated herein by reference.

134. At all times material hereto, Church had an implied duty to perform his stonework and masonry work in a good and workmanlike manner.

135. North Carolina law recognizes an implied warranty that contractors and subcontractors performing construction work will use the customary level of skill and care required for that work.

136. Church breached the implied duty of workmanlike performance by failing to perform stonework and masonry work in accordance with the customary skill and care required of masonry and stone veneer contractors, applicable building codes, manufacturer requirements, industry standards, the Plans, and good construction practices.

137. Church's breach includes, without limitation, defective or non-code-compliant stone veneer clearances, flashing, weep screeds, WRB integration, drainage, masonry interfaces, and related work as alleged above.

138. As a direct and proximate result of Church's breach of the implied duty of workmanlike performance, Plaintiff sustained physical injury to tangible property, resulting loss of use, investigation and repair costs, removal and replacement costs, delay damages, and other damages to be determined at trial.

**COUNT VIII – NEGLIGENCE**
**(Against Price)**

139. The allegations of the foregoing paragraphs are incorporated herein by reference.

140. At all times material hereto, Price was engaged in the business of framing and installing siding and cladding for compensation and held itself out as competent to perform such work on residential construction projects in North Carolina.

141. Price owed Plaintiff a duty, independent of any contract between Church and VPC, to perform its framing and siding and exterior cladding work in a reasonably safe, competent, non-negligent, and workmanlike manner and in compliance with applicable building codes, manufacturer requirements, industry standards, the Plans, and good construction practices.

142. Price knew or should have known that its framing work would be incorporated into Plaintiff's residence and that defective, non-code-compliant, or improperly constructed framing would cause or contribute to structural

deficiencies, water intrusion, misalignment of building components, damage to other portions of the residence, diminution in value, and the need for substantial corrective and repair work.

143. Price knew or should have known that its siding and exterior cladding work would be incorporated into Plaintiff's residence and that defective, non-code-compliant, or improperly integrated siding and cladding would cause or contribute to building-envelope defects and damage or risk of damage to the residence, including wall assemblies, cladding, sheathing, framing, flashing, WRB components, finishes, and other tangible property.

144. Price breached its duties by, among other things:

a. Failing to perform all framing work in a good and workmanlike manner;

b. Failing to perform siding and cladding work in a good and workmanlike manner;

c. Failing to comply with applicable building codes, manufacturer requirements, industry standards, and the Plans;

d. Failing to install natural wood siding with required nailing strips or blocking;

e. Failing to install wood exterior wall cladding, including natural wood siding and bark shingles, with required clearances over horizontal flashing;

f. Failing to install siding and exterior cladding work in a manner that maintained required building-envelope drainage and water-management performance;

g. Failing to prevent siding and cladding work from creating building-envelope intersections susceptible to failure, water intrusion, and premature deterioration; and

h. Such other and further acts of negligence as shall be shown in discovery or at trial

145. Price's negligence caused or contributed to physical injury to tangible property, including exterior wall assemblies, cladding, sheathing, framing, flashing, WRB components, finishes, and related components of the residence.

146. Price's negligence caused or contributed to the need for further investigation and remediation of framing, siding, cladding, flashing interfaces, and affected wall assemblies, together with resulting loss of use, repair costs, removal and replacement costs, and other damages to be determined at trial.

147. As a direct and proximate result of Price's negligence, Plaintiff has been damaged in an amount to be determined at trial, but in excess of $75,000.

**COUNT IX – BREACH OF THE IMPLIED DUTY OF WORKMANLIKE PERFORMANCE**
**(Against Price)**

148. The allegations of the foregoing paragraphs are incorporated herein by reference.

149. At all times material hereto, Price had an implied duty to perform its framing, siding and cladding work in a good and workmanlike manner.

150. North Carolina law recognizes an implied warranty that contractors and subcontractors performing construction work will use the customary level of skill and care required for that work.

151. Price breached the implied duty of workmanlike performance by failing to perform framing and siding and cladding installation services in accordance with the customary skill and care required of masonry and stone veneer contractors, applicable building codes, manufacturer requirements, industry standards, the Plans, and good construction practices.

152. Price's breach includes, without limitation, defective or non-code-compliant framing work, installation of natural wood siding without required nailing strips or blocking and installation of natural wood siding and bark

shingles above horizontal flashing without required clearances, among other things.

153. As a direct and proximate result of Price's breach of the implied duty of workmanlike performance, Plaintiff sustained physical injury to tangible property, resulting loss of use, investigation and repair costs, removal and replacement costs, delay damages, and other damages to be determined at trial.

## COUNT X – NEGLIGENCE (Against Watauga Valley Services)

154. The allegations of the foregoing paragraphs are incorporated herein by reference.

155. At all times material herein, WVS was engaged in the business of providing concrete installation, slab construction, and related construction services for compensation and held itself out as competent to perform such work on residential construction projects in North Carolina.

156. WVS was retained by VPC to provide labor and materials used to pour and install the basement concrete slab-on-ground for the Project.

157. WVS owed Plaintiff a duty, independent of any contract between WVS and VPC, to perform its concrete slab work in a reasonably safe, competent, non-negligent, and workmanlike manner and in compliance with

applicable building codes, industry standards, ACI standards, the Plans, specifications, and good construction practices.

158. WVS knew or should have known that its concrete slab work would be incorporated into Plaintiff's residence and would serve as the substrate for finished flooring and other completed building components, and that defective, uneven, unlevel, improperly sloped, non-code-compliant and improperly constructed concrete slab work would cause or contribute to physical injury to the residence, including the finished wood flooring, floor assemblies, finishes, and related tangible property.

159. WVS breached its duties by, among other things:

a. Failing to perform concrete slab work in a good and workmanlike manner;

b. Failing to install the concrete slab in compliance with applicable building codes, ACI standards, industry standards, the Plans, specifications, and good construction practices;

c. Failing to install the concrete slab within applicable tolerances for slope, flatness, and levelness;

d. Installing, constructing, and/or leaving in place a concrete slab with elevation variations and localized undulations exceeding applicable ACI standards and the allowable slope tolerances for the Project;

e. Failing to identify, correct, grind, level, remediate, or otherwise address the defective, uneven, unlevel, and improperly sloped concrete slab before subsequent trades installed finished flooring over the slab;

f. Failing to coordinate its work with VPC and other trades to ensure that the concrete slab was suitable to receive finished wood flooring; and

g. Such other and further acts of negligence as shall be shown in discovery or at trial.

160. WVS's negligence caused or contributed to physical injury to tangible property, including the finished wood flooring, floor coverings, the house framing in the basement and upper levels, finishes, and other related building components of the residence.

161. WVS's negligence also caused resulting loss of use and required or will require investigation, removal, demolition, grinding, leveling, reconstruction, repair, replacement, and remediation of defective and damaged components, including completed components not themselves defectively installed but necessarily removed or damaged to access and correct the resulting damage.

162. As a direct and proximate result of WVS's negligence, Plaintiff has been damaged in an amount to be determined at trial, but in excess of $75,000.

## COUNT XI – BREACH OF THE IMPLIED DUTY OF WORKMANLIKE PERFORMANCE (Against Watauga Valley Services)

163. The allegations of the foregoing paragraphs are incorporated herein by reference.

164. At all times material herein, WVS had an implied duty to pour the concrete slab work in a good and workmanlike manner.

165. North Carolina law recognizes an implied warranty that contractors and subcontractors performing construction work will use the customary level of skill and care required for that work.

166. WVS breached the implied duty of workmanlike performance by failing to install the concrete slab in accordance with the customary skill and care required of concrete contractors, applicable building codes, ACI standards, industry standards, the Plans, specifications, and good construction practices.

167. WVS's breach includes, without limitation, defective, uneven, unlevel, improperly sloped, non-code-compliant, and nonconforming concrete slab work, including elevation variations and localized undulations exceeding applicable ACI standards and allowable slope tolerances, among other things.

168. As a direct and proximate result of WVS's breach of the implied duty of workmanlike performance, Plaintiff sustained physical injury to tangible property, resulting loss of use, investigation and repair costs, removal

and replacement costs, delay damages, and other damages to be determined at trial.

**COUNT XII – NEGLIGENCE**
**(Against A Flooring Outlet)**

169. The allegations of the foregoing paragraphs are incorporated herein by reference.

170. At all times material herein, AFO was engaged in the business of supplying and installing wood flooring and related flooring materials for compensation and held itself out as competent to perform such work on residential construction projects in North Carolina.

171. AFO was retained by VPC to provide wood flooring installation on the Project, including installation of Middleton Spanish Moss flooring, floor preparation, cleaning and covering, supplying ram board, tape, additional Spanish Moss flooring, Spanish Moss t-molding, stairnose materials, and related labor.

172. AFO owed Plaintiff a duty, independent of any contract between AFO and VPC, to perform its flooring work in a reasonable, competent, non-negligent, and workmanlike manner and in compliance with applicable building codes, manufacturer requirements, industry standards, the Plans, specifications, and good construction practices.

173. AFO knew or should have known that its wood flooring work would be incorporated into Plaintiff's residence and that defective, improperly installed, insecure, loose, nonconforming, or non-code-compliant flooring work would cause or contribute to physical injury to the residence, including the finished wood flooring, floor coverings, floor assemblies, finishes, and related tangible property.

174. AFO further knew or should have known that finished wood flooring should not be installed over an unsuitable, uneven, unlevel, improperly sloped, or nonconforming concrete slab without appropriate investigation, preparation, leveling, remediation, correction, and/or notice to VPC and Plaintiff.

175. AFO breached its duties by, among other things:

a. Failing to perform wood flooring installation in a good and workmanlike manner;

b. Failing to comply with applicable building codes, manufacturer requirements, industry standards, the Plans, specifications, and good construction practices;

c. Installing wood flooring over a concrete slab that was uneven, unlevel, improperly sloped, and/or otherwise unsuitable to receive finished flooring;

d. Failing to properly inspect, test, verify, or confirm that the concrete slab was suitable to receive the wood flooring before installation;

e. Failing to adequately grind, level, prepare, remediate, or otherwise address the slab conditions before installing the wood flooring;

f. Installing wood flooring in a manner that resulted in insecure, loose, uneven, and/or nonconforming floor covering conditions;

g. Failing to warn VPC and Plaintiff that the concrete slab conditions were unsuitable for finished wood flooring installation; and

h. Such other and further acts of negligence as shall be shown in discovery or at trial.

176. AFO's negligence caused or contributed to physical injury to tangible property, including the finished wood flooring, floor coverings, floor assemblies, finishes, and related building components of the Project.

177. AFO's negligence also caused resulting loss of use and required or will require investigation, removal, demolition, reconstruction, repair, replacement, and remediation of defective and damaged components, including completed components not themselves defectively installed but necessarily removed or damaged to access and correct the resulting damage.

178. As a direct and proximate result of AFO's negligence, Plaintiff has been damaged in an amount to be determined at trial, but in excess of $75,000.

**<u>COUNT XIII – BREACH OF THE IMPLIED DUTY OF WORKMANLIKE PERFORMANCE</u>**
**<u>(Against A Flooring Outlet, Inc.)</u>**

179. The allegations of the foregoing paragraphs are incorporated herein by reference.

180. At all times material hereto, AFO had an implied duty to perform its wood flooring installation work in a good and workmanlike manner.

181. North Carolina law recognizes an implied warranty that contractors and subcontractors performing construction work will use the customary level of skill and care required for that work.

182. AFO breached the implied duty of workmanlike performance by failing to perform its wood flooring installation and related flooring services in accordance with the customary skill and care required of flooring contractors, applicable building codes, manufacturer requirements, industry standards, the Plans, specifications, and good construction practices.

183. AFO's breach includes, without limitation, installing wood flooring over an unsuitable, uneven, unlevel, improperly sloped, and/or nonconforming concrete slab; failing to properly inspect, prepare, grind, level, remediate, or otherwise address the substrate before installation; and installing wood flooring in a defective, insecure, loose, uneven, and nonconforming manner, among other things.

184. As a direct and proximate result of AFO's breach of the implied duty of workmanlike performance, Plaintiff sustained physical injury to tangible property, resulting loss of use, investigation and repair costs, removal and replacement costs, delay damages, and other damages to be determined at trial.

**COUNT XIV – NEGLIGENCE**
**(Against Areté Engineers)**

185. The allegations of the foregoing paragraphs are incorporated herein by reference.

186. At all times material hereto, Areté was engaged in the business of providing professional engineering services for compensation and was retained by VPC to provide structural engineering for the Project.

187. Areté owed Plaintiff a duty to exercise the degree of care, skill, and diligence ordinarily exercised by engineers engaged in similar professional practice under similar circumstances.

188. Areté knew or should have known that its structural engineering work would be used to construct Plaintiff's residence and that Plaintiff, VPC, subcontractors, trades, building officials, and others would rely on Areté's drawings, calculations, details, markups, approvals, and engineering decisions.

189. Areté's duties included, without limitation, the duty to provide adequate, accurate, complete, coordinated, and code-compliant structural engineering sufficient to permit construction of the residence in accordance with the 2018 North Carolina Residential Code, applicable professional standards, and the applicable standard of care.

190. Areté breached its duties by, among other things:

a. Failing to provide adequate structural engineering for the Project;

b. Failing to provide a sufficient load path in accordance with applicable codes and standards;

c. Failing to adequately design or detail ridge beams, lateral load support, point loads, foundation and framing support, roof framing, deck structures, and other structural components;

d. Failing to provide adequate calculations, drawings, specifications, details, and coordination for structural components that did not satisfy prescriptive design requirements;

e. Failing to identify and correct conflicts between the Plans, structural drawings, shop drawings, field conditions, and as-built construction;

f. Failing to provide adequate engineering for the sliding window-wall and related structural components;

g. Failing to exercise reasonable care in reviewing, revising, marking up, approving, or coordinating structural drawings and field conditions;

h. Failing to warn Plaintiff, VPC, or others that the Plans and structural drawings were inadequate, incomplete, inaccurate, or not ready for construction; and

i. Such other and further acts of negligence and professional negligence as shall be shown in discovery or at trial.

191. Areté's negligence caused or contributed to defective and non-code-compliant construction, unknown or inadequate structural capacity, defective load paths, defective framing, defective roof and deck assemblies, and the need for substantial structural analysis, redesign, remediation, removal, reconstruction, repair, and replacement.

192. Areté's negligence caused or contributed to physical injury to tangible property, including structural framing, roof assemblies, deck assemblies, wall assemblies, cladding, sheathing, finishes, and related building components, and caused resulting loss of use of portions of the residence.

193. As a direct and proximate result of Areté's negligence, Plaintiff has been damaged in an amount to be determined at trial, but in excess of $75,000.

**COUNT XV – BREACH OF THE IMPLIED DUTY THAT THE PLANS ARE ADEQUATE, ACCURATE AND COMPLETE**
**(Against Areté Engineers)**

194. The allegations of the foregoing paragraphs are incorporated herein by reference.

195. Areté undertook to provide engineering plans, drawings, calculations, details, markups, approvals, and related structural engineering services for the Project.

196. Areté owed an implied duty that the engineering plans, drawings, calculations, details, and specifications it prepared, revised, reviewed, approved, or provided for the Project were adequate, accurate, and complete for the residence being constructed.

197. Areté breached this implied duty by, among other things:

a. Failing to provide structural drawings and engineering sufficient to satisfy applicable code requirements;

b. Failing to provide adequate load-path, point-load, lateral-load, roof, ridge beam, deck, foundation, and framing design;

c. Failing to provide adequate and coordinated engineering for structural conditions that did not satisfy prescriptive design requirements;

d. Failing to provide plans and details sufficient for VPC and its subcontractors to construct the Project in a code-compliant and workmanlike manner;

e. Failing to identify and correct conflicts, omissions, and deficiencies in the Plans and structural drawings;

f. Failing to provide adequate plans and engineering for the sliding window-wall and other structural components; and

g. Such other and further breaches as shall be shown in discovery or at trial.

198. As a result of Areté's breach, the Project was constructed with defective, inadequate, incomplete, or non-code-compliant structural components and required substantial investigation, analysis, redesign, remediation, repair, removal, replacement, and reconstruction.

199. As a direct and proximate result of Areté's breach of the implied duty that the plans are adequate, accurate and complete, Plaintiff has been damaged in an amount to be determined at trial

**ATTORNEYS' FEES**

Plaintiff seeks to recover reasonable attorneys' fees incurred in conjunction with this action under applicable law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays the court to grant it the following relief:

1. Enter a judgment in favor of Plaintiff against Defendant, VPC under 28 U.S.C. § 2201 declaring that Plaintiff is entitled to prevail on the rights and obligations stated above and that VPC is entitled to no relief against Plaintiff;

2. Enter a judgment in favor of Plaintiff and against Defendant, VPC on his claims of breach of contract, breach of the covenant of good faith and fair dealing, breach of implied duty that plans and specifications are adequate, accurate and complete, and breach of the implied duty of workmanlike performance;

3. Enter a judgment in favor of Plaintiff and against Defendant Church on Plaintiff's claims for negligence and breach of the implied duty of workmanlike performance;

4. Enter a judgment in favor of Plaintiff and against Defendant WVS on Plaintiff's claims for negligence and breach of the implied duty of workmanlike performance;

5. Enter a judgment in favor of Plaintiff and against Defendant AFO on Plaintiff's claims for negligence and breach of the implied duty of workmanlike performance;

6. Enter a judgment in favor of Plaintiff and against Defendant Areté Engineers on Plaintiff's claims for negligence and breach of the implied duty that the plans are adequate, accurate and complete

7. Award Plaintiff his actual, compensatory, consequential, economic, and punitive damages against Defendants, jointly and severally as appropriate, in amounts to be determined at trial, plus prejudgment interest, costs and fees as may be properly awarded;

8. Award Plaintiff damages for investigation, testing, engineering, remediation, repair, replacement, demolition, removal, reconstruction, completion, resulting property damage, loss of use, delay, general conditions, carrying costs, overpayments, and other damages to be proven at trial.

9. Award reasonable attorneys' fees to Plaintiff under applicable law;

10. Tax costs and fees against Defendants under applicable law;

11. Trial by jury as to all issues; and

12. For such other and further relief and the Court deems just and proper.

Respectfully submitted this the 28th day of July, 2026.

**s/ Paul A. Capua**

Paul A. Capua / N.C. State Bar No. 40239
*Attorney for Plaintiff*
CAPUA LAW FIRM, PA
118 North Depot Street
Boone, NC 28607
Telephone: (828) 264-0260
Fax: (828) 378-0236
E-mail: paul@capualaw.com

## CERTIFICATE OF SERVICE

The undersigned, being an attorney duly licensed to practice law in the State of North Carolina and the Western District of North Carolina, does hereby certify that the **FIRST AMENDED COMPLAINT AND REQUEST FOR DECLARATORY RELIEF** was served via CM/ECF to the following:

Nathan Miller
MILLER & JOHNSON, PLLC
756 W King St,
Boone, NC 28607
nathan@millerandjohnsonlaw.com
*Attorneys for Defendant, VPC*

Paul Culpepper
YOUG MORPHIS, et al.
PO Drawer 2428
Hickory, NC 28603
paulc@hickorylaw.com
*Attorneys for Defendant, VPC*

This the 28th day of July, 2026.

/s/ **Paul A. Capua**
Paul A. Capua – NC Bar No. 40239