EXHIBIT B

STATE OF NORTH CAROLINA

COUNTY OF AVERY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
22-CVS-1

VPC BUILDERS, LLC,

Plaintiff,

v.

DONALD W. WALLACE and wife, ERIKA R. WALLACE,

Defendants.

DONALD W. WALLACE and wife, ERIKA R. WALLACE,

Counterclaim Plaintiffs,

v.

VPC BUILDERS, LLC,

Counterclaim Defendant.

**DONALD W. WALLACE AND WIFE, ERIKA R. WALLACE'S MOTION TO STAY AND COMPEL ARBITRATION**

**- and -**

**MOTION TO DISMISS PURSUANT TO RULES 12(b)(3) and 12(b)(6) OR, IN THE ALTERNATIVE, TO TRANSFER VENUE**

**- and -**

**ANSWER AND AFFIRMATIVE DEFENSES**

**- and -**

**COUNTERCLAIMS**

NOW COME Defendants Donald W. Wallace and wife, Erika R. Wallace (collectively, "Defendants" or the "Wallaces"), by and through undersigned counsel, and respond to the Complaint of Plaintiff VPC Builders, LLC ("Plaintiff" or "VPC"), as follows:

## MOTION TO STAY AND COMPEL ARBITRATION

Pursuant to N.C. Gen. Stat. § 1-569.1, *et seq.* and 9 U.S.C. § 1, *et seq.*, the Wallaces hereby move this Court to stay this action pending arbitration and, to the extent necessary, to compel arbitration of all disputes between the parties to this lawsuit arising out of or relating to the project that is the subject of this lawsuit. In support of this Motion, and in addition to the forthcoming Memorandum of Law which will be submitted pursuant to the North Carolina Rules of Civil Procedure and the Local Rules, the Wallaces show the Court as follows:

1. On or about June 26, 2017, the Wallaces and VPC entered into a Cost Plus Construction Contract (the "Contract"), whereby VPC agreed to serve as the general contractor for the construction of the Wallaces' new residence located at 377 Lodge Ridge Trail, Beech Mountain [Banner Elk], NC (the "Project").

2. A copy of the Contract is attached hereto as **Exhibit A.**

3. The Contract contains a written agreement to arbitrate disputes:

> In the event a dispute arises under this Contract, Owner and Contractor agree to arbitration the dispute in a binding arbitration proceeding. Any such arbitration shall be conducted by an arbitrator experienced in Construction.

*See* Exhibit A, Contract, ¶ 26.

4. Pursuant to the terms of the Contract, including the written agreement to arbitrate disputes contained therein, the Wallaces hereby demand in writing that the parties to this litigation arbitrate all controversies, claims or disputes arising among them, including but not limited to those arising under the Contract and/or in connection with the Project, and any rights and obligations between the parties, in accordance with any agreement the parties may hereafter enter into.

5. As such, the Wallaces move this Court, pursuant to N.C. Gen. Stat. § 1-569.1 and 9 U.S.C. § 1, *et seq.*, to enter an Order staying this action and compelling the parties to arbitration of the claims and disputes asserted herein.

6. Prior to having this Motion heard, the undersigned will confer with Plaintiff's counsel regarding whether he consents to this Motion.

## MOTION TO DISMISS PURSUANT TO RULES 12(b)(3) and 12(b)(6) OR, IN THE ALTERNATIVE, TO TRANSFER VENUE

Without waiving the right to resolve the disputes specified in the Complaint by arbitration (and specifically reiterating their intent to proceed in arbitration), pursuant to Rule 12(b)(3) of the North Carolina Rules of Civil Procedure, the Wallaces hereby move to dismiss this action on the grounds of improper venue or division. The Wallaces further move, pursuant to Rule 12(b)(6), for a dismissal of Plaintiff's claims on the grounds that Plaintiff has failed to state a claim upon which relief can be granted.

In support of this Motion, and in addition to the forthcoming Memorandum of Law which will be submitted pursuant to the North Carolina Rules of Civil Procedure and the Local Rules, the Wallaces show the Court as follows:

1. The Contract contains a mandatory venue provision:

> This Contract is entered into in Watauga County, North Carolina, and shall be construed in accordance with the laws of the State of North Carolina. The parties hereby agree that Watauga County, North Carolina as **the exclusive venue** for the resolution of any disputes arising as a result of this Contract.

*See* Exhibit A, Contract, ¶ 25 (emphasis added).

2. As such, the Wallaces move, pursuant to Rule 12(b)(3), for an Order dismissing this action for improper venue.

3. In addition, the Wallaces move, pursuant to Rule 12(b)(6), for an Order dismissing VPC's second cause of action for "Enforcement of Claim of Lien" for failure to state a claim upon which relief can be granted, as, among other things, the lien has not been properly perfected under Chapter 44A of the North Carolina General Statutes.

4. In the alternative, the Wallaces move to transfer the venue of this action to Watauga County, North Carolina.

5. Prior to having this Motion heard, the undersigned will confer with Plaintiff's counsel regarding whether he consents to this Motion.

## ANSWER AND AFFIRMATIVE DEFENSES

Without waiving the right to resolve the disputes specified in the Complaint by arbitration (and specifically reiterating their intent to proceed in arbitration), and/or to dismiss this action pursuant to Rule 12(b)(3) and 12(b)(6), the Wallaces, pursuant to Rules 12 and 13 of the North Carolina Rules of Civil Procedure, hereby answer and allege the Plaintiff's Complaint as follows:

### PARTIES

1. Admitted upon information and belief.

2. It is admitted that Defendants are citizens and residents of Florida. Except as expressly admitted, denied.

### JURISDICTION AND VENUE

3. Admitted.

4. Denied.

### FACTUAL ALLEGATIONS

5. The Wallaces lack sufficient information to form a belief as to the truth of the allegations of Paragraph 5 of the Complaint and therefore deny same.

6. The Wallaces lack sufficient information to form a belief as to the truth of the allegations of Paragraph 6 of the Complaint and therefore deny same.

7. Admitted.

8. Admitted.

9. The Wallaces admit that Plaintiff agreed to construct the residential home for them on the Defendants' Real Property and that the plans had just begun being drawn. The Wallaces further admit that the ensuing Contract is in writing, speaks for itself, and is the best evidence of its contents. To the extent the allegations of Paragraph 9 contradict such writing, the Wallaces deny those allegations. Except as expressly admitted, denied.

10. The Wallaces admit that Plaintiff began certain work prior to the written Contract being fully executed. Except as expressly admitted, denied.

11. The Wallaces admit that Plaintiff began construction of the Project on or around September 2016. Except as expressly admitted, the Wallaces lack sufficient information to form a belief as to the truth of the allegations of Paragraph 11 of the Complaint and therefore deny same.

12. The Wallaces admit that, during the earlier course of the Project, certain invoices and receipts were submitted to them, which they paid. Except as expressly admitted, denied.

13. The Wallaces admit that, on June 26, 2017, they and VPC entered into a Cost Plus Construction Contract (the "Contract"), which is in writing, speaks for itself, and is the best evidence of its contents. The Wallaces further admit that the contract attached as Exhibit A appears to be a true and correct copy of the same. Except as expressly admitted, denied.

14. The Contract is in writing, speaks for itself, and is the best evidence of its contents. To the extent the allegations of Paragraph 14 contradict such writing, the Wallaces deny those allegations. Except as expressly admitted, denied.

15. The Contract is in writing, speaks for itself, and is the best evidence of its contents. To the extent the allegations of Paragraph 15 contradict such writing, the Wallaces deny those allegations. Except as expressly admitted, denied.

16. The invoices and receipt are in writing, speak for themselves, and are the best evidence of their contents. To the extent the allegations of Paragraph 16 contradict such writings, the Wallaces deny those allegations. Except as expressly admitted, denied.

17. Admitted.

18. The Wallaces admit that the construction process continued through July 2021, and that there were various causes of delay, including delays by VPC. Except as expressly admitted, denied.

19. The Wallaces deny that they hired any project manager with "no construction experience." As for what this project manager told the subcontractors, the Wallaces lack sufficient information to form a belief as to the truth of the allegations of Paragraph 19 of the Complaint and therefore deny same. Except as expressly admitted, denied.

20. The Wallaces admit that, at some point during the Project, they enlisted the services of Don Johnson to inspect the work. Except as expressly admitted, denied.

21. Denied.

22. The Wallaces admit that Plaintiff continued work on the Project and that they occupied the home while some items remained outstanding. Except as expressly admitted, denied.

23. The Wallaces admit that they developed a punch list, and that Plaintiff agreed to complete some, but not all, of the items on the punch list. Except as expressly admitted, denied, and specifically denied that Plaintiff abided by its contractual and non-contractual obligations with respect to the punch list.

24. The Wallaces admit that they paid Plaintiff what Plaintiff was owed. Except as expressly admitted, denied.

25. The Wallaces admit that VPC presented what it deemed a final bill to them. Except as expressly admitted, denied.

26. Denied.

27. It is admitted that the Wallaces did not allow VPC to utilize the large piece of equipment, but for various reasons, including, without limitation, that VPC did not coordinate the delivery of the same with the Wallaces; VPC confirmed that the equipment would damage the landscaping and require the removal of some trees; VPC was trying to store the equipment on the neighbors' property despite the Wallaces' request for them not to do so; etc. Except as expressly admitted, denied.

28. Admitted.

29. The Wallaces admit that Plaintiff has failed to complete the punch list. Except as expressly admitted, denied, and specifically denied that the Wallaces are the cause of Plaintiff's failure to complete the punch list items.

30. The final bill is in writing, speaks for itself, and is the best evidence of its contents. To the extent the allegations of Paragraph 30 contradict such writing, the Wallaces deny those allegations. Except as expressly admitted, denied.

31. The Wallaces admit that they have not paid the purported final bill, but expressly deny that such amounts were owed VPC. Except as expressly admitted, denied.

32. The lien is in writing, speaks for itself, and is the best evidence of its contents. To the extent the allegations of Paragraph 32 contradict such writing, the Wallaces deny those allegations. Except as expressly admitted, denied.

**FIRST CAUSE OF ACTION**

**BREACH OF CONTRACT**

33. The Wallaces reallege and incorporate by reference their answers to the allegations contained in Paragraphs 1-32 above.

34. The Contract is in writing, speaks for itself, and is the best evidence of its contents. To the extent the allegations of Paragraph 34 contradict such writing, the Wallaces deny those allegations. Except as expressly admitted, denied.

35. Denied.

36. Denied.

37. Denied.

38. Denied.

**SECOND CAUSE OF ACTION**

**ENFORCEMENT OF CLAIM OF LIEN**

39. The Wallaces reallege and incorporate by reference their answers to the allegations contained in Paragraphs 1-38 above.

40. The Wallaces admit that the Plaintiff filed a Claim of Lien on Real Property, which is in writing, speaks for itself, and is the best evidence of its contents. To the extent the allegations of Paragraph 40 contradict such writing, the Wallaces deny those allegations. Except as expressly admitted, denied.

41. Admitted.

42. Denied.

43. Denied.

**THIRD CAUSE OF ACTION**

**QUANTUM MERUIT/UNJUST ENRICHMENT**

44. The Wallaces reallege and incorporate by reference their answers to the allegations contained in Paragraphs 1-43 above.

45. Admitted.

46. Denied.

47. Denied.

48. Denied.

49. Denied.

50. Denied.

51. Denied.

52. Denied.

## AFFIRMATIVE DEFENSES

### First Defense

The Complaint fails to state a claim against the Wallaces upon which relief can be granted and should be dismissed pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure.

### Second Defense

Plaintiff's claims are barred, in whole or in part, under the doctrines of laches, unclean hands, waiver, and/or estoppel.

### Third Defense

Plaintiff's claims are barred, in whole or in part, due to Plaintiff's failure to mitigate its damages, if any.

### Fourth Defense

Plaintiff's claims are barred, in whole or in part, by the failure of the occurrence of one or more conditions precedent to this action.

### Fifth Defense

Plaintiff's claims are barred, in whole or in party, because if Plaintiff has suffered any damage or injury, which is expressly denied, any such damage or injury was not caused by an act

or omission of the Wallaces, but of others for whom the Wallaces have no legal or contractual responsibility.

**Sixth Defense**

Plaintiff's claims are barred, in whole or in part, because, to the extent that the Wallaces owed any legal duty to Plaintiff, the Wallaces did not breach any such duty.

**Seventh Defense**

The Wallaces allege that although they deny having any liability to Plaintiff, if Plaintiff has any recovery, the Wallaces are entitled to an offset of any amount Plaintiff obtains from other parties.

**Eighth Defense**

The Wallaces allege that the lien on real property which forms the basis for Plaintiff's claim of foreclosure is inaccurate, false, and/or fictitious, and therefore invalid as a matter of law.

**Ninth Defense**

The Wallaces allege that Plaintiff has failed to comply with the substantive and procedural requirements of N.C. Gen. Stat. § 44A-12 *et seq.*, and therefore, its claim of lien is fatally defective.

**Tenth Defense**

The Wallaces allege that Plaintiff is not entitled to the amount is has alleged because of overcharges and substandard work it performed on the Property.

**Eleventh Defense**

The Wallaces allege that Plaintiff is not entitled to equitable relief as it has an adequate remedy at law, and therefore, its claims for quantum meruit should be dismissed.

**Twelfth Defense**

Plaintiff's claims are barred, in whole or in part, due to Plaintiff's oral and/or written modifications of the same.

### Thirteenth Defense

Wallaces reserve the right to assert any additional affirmative defenses that may be warranted based upon discovery in this action.

## COUNTERCLAIMS

Without waiving the right to resolve the disputes specified in the Complaint by arbitration (and specifically reiterating their intent to proceed in arbitration), and/or to dismiss this action pursuant to Rules 12(b)(3) and 12(b)(6), pursuant to Rule 13 of the North Carolina Rules of Civil Procedure, Counterclaim Plaintiffs Donald W. Wallace and Erika R. Wallace (collectively, the "Wallaces"), by and through their undersigned counsel of record, complaining of Counterclaim Defendant VPC Builders, LLC ("VPC"), hereby allege and assert the following Counterclaims:

### PARTIES, JURISDICTION, AND VENUE

1. The Wallaces are individual citizens and residents of Hillsborough County, Florida.

2. Upon information and belief, VPC is a North Carolina limited liability company with its principal place of business in Avery County, North Carolina.

3. This Court has personal jurisdiction over VPC pursuant to N.C. Gen. Stat. § 1-75.4.

4. This Court has subject matter jurisdiction over VPC pursuant to N.C. Gen. Stat. § 7A-240, *et seq.* and Rule 13 of the North Carolina Rules of Civil Procedure.

5. Venue is proper in Watauga County, North Carolina, pursuant to the Contract between the parties. Venue is pending pursuant to the foregoing Motion to Dismiss or, in the alternative, Motion to Transfer.

### FACTS

6. On or about June 26, 2017, the Wallaces and VPC entered into a Cost Plus Construction Contract (the "Contract"), whereby VPC agreed to serve as the general contractor for

the construction of the Wallaces' new residence located at 377 Lodge Ridge Trail, Beech Mountain [Banner Elk], NC (the "Project").

7. During the span of approximately five years, VPC performed work and services on the Project, well beyond the original timeline for completion.

8. In or about May 2020, the Wallaces alerted VPC to the issue of water intrusion and/or water leaks in connection with the rafter tail beams.

9. Upon information and belief, VPC denied any significant issues with the beams, contending that the beams were installed correctly.

10. During this time, the Wallaces began noting issues with various other aspects of the Project, and so, in or about July 2020, the Wallaces hired a third-party consultant to investigate certain of the issues the Wallaces were experiencing at their home.

11. Upon information and belief, the third-party consultant noted that the rafter tail beams were deficient, in that, among other things, they did not have adequate flashing, the trim was not cut to fit snugly beneath the beams, etc.

12. Around the same time, the Wallaces expressed concerns to VPC regarding other defects at the Project, including, without limitation, water intrusion and leaks in connection with the windows and doors; curling/cupping of nickel gap boards; deficient roof framing; missing and/or deficient flashing; deficient exterior trim; and other items.

13. On or about September 22, 2020, the Certificate of Occupancy was issued.

14. On or about October 6, 2020, the Wallaces sent to VPC a working punch list for the Project's exterior.

15. In or about the same month – October 2020 – VPC began performing some repair work to the rafter tail beams, but, upon information and belief, such repairs were delayed and not

completed in sufficient time to allow for curing of the material before the weather got too cold (lending to other forthcoming issues with the same).

16. On or about November 12, 2020, the Wallaces sent to VPC updated punch lists.

17. VPC failed to adequately, successfully, and/or correctly address the punch list items in the time specified in the Contract.

18. Upon information and belief, VPC also inhibited the Wallaces from having the punch list work addressed by the subcontractors when VPC did not willingly agree to handle the work.

19. VPC never provided to the Wallaces a detailed, line-by-line estimate of the cost to complete the punch list, for the Wallaces' review and approval, as was required by the Contract.

20. Over the next couple of months (near the end of 2020 and the beginning of 2021), the Wallaces continued to alert VPC to numerous failures at the Project, including, without limitation, issues with the windows, doors, and beams.

21. Despite multiple instances of notice to VPC, and despite some inadequate attempts by VPC to repair, the leaks and issues at the Project continue to occur.

22. Moreover, throughout the course of the Project, VPC failed to properly or sufficiently invoice the Wallaces, failing to initially provide certain back-up documentation and/or billing for repairs to work already performed or some isolated punch list items

23. As such, in or around July 2021, VPC ceased work on the Project.

24. In addition, upon information and belief, during its time on the Project, VPC was either not properly consulting and/or relying upon the design documents for the Project, or it was using design drawings that had not yet been finalized and/or sealed.

25. Upon current information and belief, the Project suffers from multiple significant issues and defects, including, without limitation, the following structural and construction deficiencies:

a. Water intrusion, leaks, and existing damage around the windows and doors in general;

b. Lack of proper coating and/or priming of all exterior trim surfaces;

c. Improper configuration of window channels, leading to the flow of water to the intersections between the cedar trim;

d. Deficient placement and operation of various structural door screws;

e. Deficient and/or missing nails at the window nail fins;

f. Insufficient, improper, absent, or failing fasteners in various areas;

g. Improperly-sized and/or missing sheathing;

h. Missing structural connections at window headers;

i. Improper connections between headers and steel framing;

j. Insufficient and/or improper headers and header support, as well as improper connections at the header ends;

k. Insufficient amount of jack studs and/or full height king studs at various locations;

l. Over-driven sheathing fasteners;

m. Improper wood framing of fenestration openings;

n. Deficient or missing flashing;

o. Numerous deficiencies with regard to the lift-and-slide door off the kitchen, including, without limitation, insufficient support of framing at the lift-and-slide door pocket;

p. Offset and/or gapping wood floor planks and trim-to-floor intersections;

q. Deflection in the kitchen wood floor;

r. Incomplete load paths from the roof to the foundation;

s. Improper tie-downs and/or missing metal straps at various locations;

t. Improper connection of bifold door to steel framing;

u. Failure to paint and seal the exterior trim and siding on all six sides; and

v. Other ways which will be proven at the time of trial in this matter.

26. In response to the undeniable and numerous deficiencies at the Project, the Wallaces, on multiple occasions, put VPC on notice of its defaults and its obligation to cure the same.

27. To date, VPC has not cured or indicated that it can adequately cure the significant issues at the Project.

28. Again, upon information and belief, the above-listed deficiencies at the Project are not the sole or exclusive issues.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract and Warranty)**

29. The allegations of the preceding paragraphs are realleged and incorporated by reference as if fully set forth herein.

30. The Wallaces and VPC entered into the Contract, which constitutes a valid, binding, and enforceable agreement between the parties.

31. The Contract contained warranties therein, the terms of which are incorporated herein by reference.

32. The Wallaces have fully, timely, and properly performed their obligations under the Contract.

33. All feasible conditions precedent have been satisfied, at least substantially.

34. VPC has breached the Contract as set forth above and herein, and in the following, non-exclusive ways:

a. By failing to substantially complete the Project within the timeframe provided in the Contract;

b. By failing to utilize sealed and/or adequate or complete drawings from the architect;

c. By failing to assure that all work at the Project (i) was done in accordance with the Contract Documents, (ii) was free from material structural defects, and/or (c) met or exceeded the requirements of the North Carolina Building Code (see Paragraph 25 above);

d. By failing to abide by its warranty of either (i) curing the various defects at the Project in a manner satisfactory to the Wallaces or (ii) paying the Wallaces the cost of repair or replacement of the defects;

e. By failing to complete the punch list work and/or adequately engage in the punch list process;

f. By failing to employ workers skilled in their trades to suitably perform the work at the Project;

g. By failing to adequately supervise and/or take responsibility for its subcontractors and workers at the Project;

h. By failing to honor the warranties set forth therein; and

i. In other ways to be determined at the time of trial of this matter.

35. As a direct and proximate result of the breaches by VPC, the Wallaces have been damaged in an amount in excess of $25,000, the exact amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
**(Breach of the Covenant of Good Faith and Fair Dealing)**

36. The allegations of the preceding paragraphs are realleged and incorporated by reference as if fully set forth herein.

37. The Contract contained an implied covenant of good faith and fair dealing by and between VPC and the Wallaces.

38. The Wallaces have fully performed all covenants, conditions, and obligations required of it to be performed under the Contract.

39. VPC, acting in bad faith as alleged above, breached the implied covenant of good faith and fair dealing.

40. As a direct and proximate result of the breaches by VPC, the Wallaces have been damaged in an amount in excess of $25,000, the exact amount to be proven at trial.

## THIRD CLAIM FOR RELIEF
**(Alternatively, Unjust Enrichment)**

41. The allegations of the preceding paragraphs are realleged and incorporated by reference as if fully set forth herein.

42. The Wallaces provided funds to VPC, at the request of VPC, for use in connection with the Project, as detailed above.

43. VPC voluntarily accepted, for its benefit, the funds discussed herein from the Wallaces.

44. The Wallaces did not provide such funds to VPC as a gift or gratuitously, but reasonably expected that VPC would, in exchange, perform satisfactory and defect-free work at the Project and/or ensure that its work at the Project met all relevant standards.

45. VPC knew or should have known of such reasonable expectations of the Wallaces.

46. Allowing VPC to retain the benefit of the Wallaces' funds without providing its above-described work in exchange for the same would result in unjust enrichment.

47. As a direct and proximate result of the unjust enrichment by VPC, the Wallaces have been damaged in an amount in excess of $25,000, the exact amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF
**(Negligent Retention/Hiring/Supervision)**

48. The allegations of the preceding paragraphs are realleged and incorporated by reference as if fully set forth herein.

49. As set forth above, upon information and belief, VPC recommended, retained, hired, and enlisted the services of its subcontractors, materialmen, and suppliers as part of the Project, and, in fact, controlled, oversaw and supervised their involvement in the Project.

50. VPC remained in direct contact with its subcontractors, materialmen, and suppliers throughout the Project.

51. At all relevant times, VPC had a duty to exercise due care in the hiring, supervision and retention of its subcontractors, materialmen, and suppliers.

52. VPC breached that duty and was negligent in the following non-exclusive ways: (a) VPC failed to retain and hire adequate and competent subcontractors, materialmen, and suppliers to perform work on the Project; (b) VPC failed to ensure that the subcontractors, materialmen, and suppliers that it hired on the Project performed their work and/or provided their labor and services in a manner that would be free from defects and deficiencies; (c) VPC knew or should have known in the exercise of reasonable care that its subcontractors, materialmen, and suppliers did not have the appropriate training, knowledge, skill and/or other qualities to serve in the role that VPC hired them for as part of the Project; (d) VPC failed to adequately supervise its subcontractors, materialmen, and suppliers to ensure that their work would be meeting minimum standards and would be free from defects; (e) VPC was negligent in its continued retention and

involvement of its subcontractors, materialmen, and suppliers implicated herein, in that VPC knew or should have known in the exercise of reasonable care that they would engage in the wrongdoings discussed herein, and that such conduct would have the resulting injurious effect on the Wallaces; and (f) in other ways which will be proven at trial.

53. As a direct and proximate result of VPC's negligent retention/hiring and supervision, the Wallaces have been damaged in an amount in excess of $25,000, the exact amount to be proven at trial.

**FIFTH CLAIM FOR RELIEF**
**(Negligence)**

54. The allegations of the preceding paragraphs are realleged and incorporated by reference as if fully set forth herein.

55. Pursuant to the facts set out above, VPC owed a duty to the Wallaces to perform its work in a workmanlike manner and in accordance with the applicable standard of care, building codes, good construction practices and in a sound manner.

56. VPC knew or should have known that a failure to perform its work in the manner described immediately above would cause damage to the Wallaces.

57. Upon information and belief, and as detailed above, VPC breached its duty of care by failing to, among other things, perform its services properly, in a good and workmanlike manner, in conformance with all applicable construction standards and building codes, in conformance with good construction practices, or in a manner that would render it free of defects.

58. As a direct and proximate result of VPC's negligence, the Wallaces have been damaged in an amount in excess of $25,000, the exact amount to be proven at trial.

## <u>SIXTH CLAIM FOR RELIEF</u>
**(Malicious Prosecution)**

59. The allegations of the preceding paragraphs are realleged and incorporated by reference as if fully set forth herein.

60. VPC has initiated this lawsuit by suing the Wallaces maliciously and without probable cause and participated in this action against the Wallaces.

61. Upon information and belief, VPC was aware of various defects that existed at the Project; that retainage was not owed to VPC unless it was over and above the approved estimated punch list value; that final payment was not owed until completion of punch list items, completion of the Project in accordance with the Project, etc.; and that VPC had failed to engage in the punch list process and complete the necessary punch list work as required.

62. Upon information and belief, therefore, VPC was aware that it was not entitled to payment since it did not abide by the matters set forth above.

63. As a result of the lien being filed on the Project by VPC, the Wallaces have suffered damage, including pecuniary loss.

64. Should this lawsuit terminate in the Wallaces' favor, then the Wallaces ask that the Court rule on this claim for relief.

## <u>SEVENTH CLAIM FOR RELIEF</u>
**(Abuse of Process)**

65. The allegations of the preceding paragraphs are realleged and incorporated by reference as if fully set forth herein.

66. VPC invoked process against the Wallaces and their property in an Avery County court proceeding, primarily the Claim of Lien on Real Property, Case No. 21-M-49.

67. As a result of this proceeding, the Wallaces' property was restrained or otherwise affected.

68. Upon information and belief, VPC's Claim of Lien on Real Property was filed defectively and/or for an ulterior purpose which is separate from the normal and regular purpose of the process.

69. Specifically, upon information and belief, VPC was aware that its Claim of Lien on Real Property was improper; that retainage was not owed unless it was over and above the approved estimated punch list value; that final payment was not owed until completion of punch list items, completion of the Project in accordance with the Project, etc.; that VPC had failed to engage in the punch list process and complete the necessary punch list work as required; and that it was not entitled to payment since it did not perform the work on the Property it was required to perform, e.g., in a non-defective manner.

70. Upon information and belief, VPC intentionally filed the Claim of Lien on Real Property for the purpose of hindering the Wallaces' financial situation and pecuniary status.

71. VPC's ulterior motives and willful actions were not within the proper and regular course of this proceeding.

72. As a direct and proximate result of VPC's abuse of process, the Wallaces have been damaged in an amount in excess of $25,000, the exact amount to be proven at trial.

## EIGHTH CLAIM FOR RELIEF
**(Slander of Title)**

73. The allegations of the preceding paragraphs are realleged and incorporated by reference as if fully set forth herein.

74. VPC filed a Claim of Lien on Real Property, Avery County Case No. 21-M-49, on the Wallaces' Property.

75. Upon information and belief, VPC was aware of various defects that existed at the Project; that retainage was not owed to VPC unless it was over and above the approved estimated punch list value; that final payment was not owed until completion of punch list items, completion

of the Project in accordance with the Project, etc.; and that VPC had failed to engage in the punch list process and complete the necessary punch list work as required.

76. Upon information and belief, therefore, VPC was aware that it was not entitled to payment for the reasons set forth above.

77. The claims set forth in the Claim of Lien on Real Property are false.

78. VPC published those claims with malice and knowledge of their falsity.

79. As a result of the lien being filed on the Project by VPC, the Wallaces have suffered damage, including pecuniary loss.

80. As a direct and proximate result of VPC's actions, the Wallaces have suffered a pecuniary loss in excess of $25,000.00, the exact amount to be proven at trial.

WHEREFORE, the Wallaces pray the Court as follows:

(1) That the Court enter an Order staying this action pending arbitration and, to the extent necessary, compelling the parties to this litigation arbitrate all controversies, claims or disputes arising among them, including but not limited to those arising under the Contract and/or in connection with the Project, and any rights and obligations between the parties, in accordance with any agreement the parties may hereafter enter into;

(2) That the arbitrator and/or Court dismiss this action pursuant to Rule 12(b)(3) for improper venue, or, alternatively, that it transfer this action to Watauga County, North Carolina;

(3) That the arbitrator and/or Court dismiss this action pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted;

(4) That VPC have and recover nothing from the Wallaces;

(5) That the Wallaces have and recover such other and further relief, including judgment on any counterclaims or third-party claims, as the arbitrator and/or Court may deem just and proper;

(6) Otherwise, that judgment be entered in favor of the Wallaces and against VPC in an amount in excess of $25,000 (the precise amount to be proven at trial) on the Counterclaims set forth above;

(7) That the Wallaces be awarded attorneys' fees as set forth above, pursuant to any applicable contractual provisions, and pursuant to all applicable law;

(8) That the costs of this action be taxed against VPC, as allowed by law; and

(9) For such other and further relief as the Court may deem just and proper.

THIS the 25th day of March, 2022.

ROSENWOOD, ROSE & LITWAK, PLLC

Nancy S. Litwak (NC Bar No. 47288)
1712 Euclid Avenue
Charlotte, North Carolina 28203
Telephone: 704-228-8578
Facsimile: 704-371-6400
nlitwak@rosenwoodrose.com
*Attorneys for Defendants/Counterclaim Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **DONALD W. WALLACE AND WIFE, ERIKA R. WALLACE'S MOTION TO STAY AND COMPEL ARBITRATION - and - MOTION TO DISMISS PURSUANT TO RULES 12(b)(3) and 12(b)(6) OR, IN THE ALTERNATIVE, TO TRANSFER VENUE - and - ANSWER AND AFFIRMATIVE DEFENSES - and - COUNTERCLAIMS** was served upon counsel of record by email as follows:

Nathan A. Miller
Miller & Johnson, PLLC
P.O. Box 49
Boone, NC 28607
nathan@millerandjohnsonlaw.com
*Counsel for Plaintiff/Counterclaim Defendant*

This the 25th day of March, 2022.

By: ______________________
Nancy S. Litwak

ROSENWOOD, ROSE & LITWAK, PLLC
1712 Euclid Avenue
Charlotte, NC 28203

VPC Builders
RESIDENTIAL AND COMMERCIAL

# COST PLUS CONSTRUCTION CONTRACT

THIS CONTRACT and the attached general conditions, schedules, specifications and addenda which are made part hereof, by and between VPC (Builders) LLC, A NORTH CAROLINA CORPORATION, (hereinafter Contractor) and Donald and Erika Wallace (hereinafter Owner or Owners). The parties signing this Contract on behalf of Contractor and Owner(s) warrant that each of them is fully authorized by their respective parties to execute and deliver the Contract in accordance with the terms and conditions set forth herein and any accompanying schedules or adopted change orders. Owner further warrants that he has authority to sign on behalf of all owners of the subject property. Contractor warrants that Matt Vincent has the authority to execute any and all documents on behalf of Contractor for the project covered under this Contract. Contractor warrants and guarantees that they are experienced and capable of building the Project as specified by this Contract.

AND FURTHER, whereas Contractor is a North Carolina corporation engaged in the building and construction business; and whereas, the Owner(s) is desirous of retaining the services of Contractor as contemplated by this Contract, now WITNESSETH, based on the mutual covenants and considerations contained herein, the parties hereby contract as hereinafter described.

Owner and Contractor agree that the intent of this Contract is to assure that the Owner shall be completely satisfied with the Work performed and the completed house based on approved drawings and specifications and that Contractor shall be fairly compensated for all Work performed.

FOR AND IN CONSIDERATION of the provisions undertaken and contained herein, Contractor and Owner(s) agree as follows:

1. Scope of the Work (the "Work") The Owner(s) desires to have, and Contractor agrees to construct, a new house upon property located at: ~~L-55 and L-56~~ Lot63 Lodge Ridge Trail, Lodges at Eagles Nest, Banner Elk, NC 28604 (hereinafter location). Additionally, Contractor shall furnish all materials and perform all Work as specified by this contract, and as modified by approved written change orders. Specifically, Contractor agrees to perform Work upon the property based upon the Owner approved architectural plans and specifications. In the absence of such approved plans and specifications, any and all preliminary Work to be completed shall be authorized in writing by Owner in advance of commencement of such Work. The scope of the Work to be undertaken by Contractor shall be any tasks directly or indirectly related to the construction, building, erecting, and raising of a house upon Owners property as designated by the construction documents

OWNERS INITIALS PWW EW CONTRACTOR INITIALS MV

building schedules, and change orders, and subject to acceptance of the Contract by Contractor and Owner. Contractor shall maintain a picture library of all Work as it progresses. Such pictures shall be considered visual documentation of the Work and used in conjunction with as-built drawings to locate HVAC, plumbing, electrical and other Work not visible after construction is complete. Contractor shall supply Owner with an electronic copy of all pictures on a weekly basis. In no case shall any Work be covered up prior to the required pictures being taken and submitted to Owner. Contractor agrees to take any additional pictures of the Work as requested by Owner.

2. Commencement & Substantial Completion   Work shall commence within 15 days of the obtainment of a building permit and approved finalized plans. Construction time through substantial completion is estimated to be ~~TBD-days~~ 11.12.18 as set forth in a schedule to be agreed upon by the parties. Such schedule may be adjusted via approved change order due to a change in the scope of Work or for delays caused by force majeure. Contractor warrants that scheduling and work will be performed timely and in a manner resulting in the fewest delays and most cost effective sequence.

3. Contract Price   In consideration for the Work described in Section 1 above, the Owner(s) shall pay Contractor all costs specifically incurred in the performance of this Contract plus twelve per cent (12%) margin upon the total cost of the work, unless otherwise noted in Contract. All Contractor direct costs for executives, project-management and administrative staff, insurance (with the exception of Builders Risk), overhead, and fee are included in the agreed upon margin percentage. ~~All-Contractor-direct-labor-costs-not included-in-Margin-percentage,-shall-be-included-as-a-separate-line-item-in-the-contract-budget-totals-and-shall not-be-entitled-to-a-margin-markup.~~ All contractor labor costs shall be billed at the rate set forth on Exhibit A and be considered the basis for such labor, irrespective of the net wages received by an individual laborer. Contractor shall provide Owner with a detailed estimated cost to complete the Work based on original plans and specifications. Such detail shall be broken down by trade. Should documentation sufficient to provide a meaningful estimate not be available at the time this Contract is executed, Contractor shall provide a estimate based on historical costs. Once sufficient documentation has been received, Contractor will prepare a final estimate to be reviewed with and approved by Owner and a change order issued adjusting the Contract price. Contractor shall immediately notify Owner in writing of any and all costs overruns. Contractor shall maintain a detailed record of the actual costs incurred and provide to Owner upon request. Contractor shall, under no circumstances, accept any form of compensation from a subcontractor or supplier, whether a specific amount or percentage of bid, that is in any way related to this project.

4. Initial Payment   Owner(s) and Contractor acknowledge that the Owner(s) will pay a down payment

OWNERS INITIALS ______   CONTRACTOR INITIALS ______

of ~~fifty-thousand-dollars-($50,000.00)~~ zero dollars ($0.00), upon the execution of this contract. The down payment shall be credited against the Contract Price beginning with Contactor's first Progress Payment. Should said contract be terminated for any reason Contractor shall refund to Owner said down payment, less any amounts due for costs incurred up to the date of termination and margin.

5. Progress Payments ~~On~~ By the tenth (10th) of every month, Contractor shall present to Owner an Application for Payment in a format approved by the Owner. Such format shall be approved by Owner prior to the first billing. Each Application for Payment shall be based on the previous months costs incurred less retainage as specified in Paragraph 10 of this Contract. Each Application for Payment shall be supported by copies of all subcontractor, materialman, supplier, and other miscellaneous invoices which are included in the billing. Owner shall make payment no later than ~~15~~ 10 days after receipt of a complete and accurate Application for Payment. Contractor also has the right to submit additional Applications as requested by Specialty Subcontractors in advance for required deposits. Contractor to notify Owner in advance of such additional request for payment and agree to provide Owner proof of payment of such funds or other documentation from Specialty Subcontractor if requested by Owner.

6. Change Orders Owner and Contractor acknowledge that increases or decreases in cost and time may be necessary under this Contract. The parties agree that should a change be requested:

a. Before proceeding with the proposed change order work, Contractor shall provide Owner with a detailed estimated cost of such change in work and any time impact. Such estimate shall include a breakdown of subcontractor, labor, equipment, miscellaneous costs and margin.

b. If both parties are in agreement, Owner and Contractor shall execute a change order approving said change order.

c. All change orders must be approved in writing, whether by email or other written communication. Text messages are not an approved form of change orders.

7. Time for Performance The parties agree that Contractor shall use reasonable efforts to complete the construction in accordance with the schedule approved by the parties. All parties shall act to complete the construction described within approved project schedule time.

8. Insurance Before commencing the Work and as a condition of payment, Contractor shall purchase and maintain insurance as described below from an admitted carrier to do business in North Carolina with an AM Best rating of A- VII or better that will protect Contractor and Owner from bodily injury or property damage claims arising out of its operations under this Contract, whether the operation are by Contractor, it's Consultants,

subcontractors, or anyone directly or indirectly employed by any of them, or anyone for whose acts any of them may be liable.

a. Commercial General Liability Insurance providing bodily injury liability and property damage liability with combined single limits of not less than $1,000,000 per occurrence, and $2,000,000 aggregate limits. Products and Completed Operations limits of $2,000,000 on a per occurrence basis. Owner shall be listed as an additional insured, with a separation of interest, and waiver of subrogation, and 30 day notice of cancelation. Copies of endorsements to be provided to Owner with certificate of insurance

b. Automobile liability insurance with a minimum limit of liability of not less than $300,000 per occurrence for all owned, non-owned, and hired automobiles

c. Workers Compensation per state statutory requirements.

d. Umbrella Liability insurance in an amount not less than $1,000,000 per occurrence and $1,000,000 aggregate in excess over General Liability, and Auto Liability and follows form over each.

e. Builders Risk Insurance Policy on an all risk basis for the benefit of both Owner and Contractor as insureds. The policy shall be for the full replacement value of the Project as protection against fire, vandalism, malicious mischief, or other forms of property damage that may occur. Contractor shall provide Owner with proof of premium for Builders Risk policy. Owner agrees to reimburse Contractor for such cost as a direct reimbursement. ~~Contractor shall not entitled to a margin on this cost.~~

9. <u>Subcontractors</u> Contractor may engage subcontractors as may be necessary to perform under this Contract.

a. Contractor agrees to obtain a minimum of 2 or 3 bids for any subcontract in excess of $25,000. Contractor shall provide a copy of all bid results, along with recommendations, to Owner for review and approval. For trades in which 2 or 3 bids cannot be obtained Contractor to notify Owner of such and provide a copy of the proposed subcontractors estimate or proposal to the Owner for review. Contractor to provide Owner with a copy of any and all proposals should they be requested.

b. Contractor to require proof of general liability, auto liability, and workers compensation coverage from all subcontractors. Owner to be listed as an additional insured.

c. Copies of all executed subcontracts, subcontractor change orders, and purchase orders to be provided to Owner prior to subcontractor starting Work.

OWNERS INITIALS ____ CONTRACTOR INITIALS ____



Case 1:26-cv-00145-MR-WCM Document 9-2 Filed 08/03/26 Page 28 of 37

d. All subcontractor change orders must be in writing and approved by both subcontractor and Contractor.

e. All subcontractors must maintain an up-to-date set of as-built drawings for all Work under their subcontract for submission to Contractor. Subcontractor as-built drawings shall be used by Owner's Architect for the production of a master set of drawings.

f. All subcontractors to submit a final release of lien as proof all funds have been paid and received.

g. Contractor agrees to act as Lien Agent for Owner per North Carolina requirements.

10. Retainage Owner shall withhold ten percent (10%) as retainage from the total of each progress payment (the "Retainage"). Retainage shall be released to Contractor as follows:

a. For Subcontractor retainage - Contractor may bill Owner as Subcontractor's scope of Work is 100% complete ~~at-that-phase-of-construction~~, accepted by both Owner and Contractor, and retainage is billed to and payable by Contractor.

b. Upon Substantial Completion Owner shall release all retainage over and above the approved estimated Punch list value.

c. Upon final completion, approval of all completed punch list items, and submission of any and all required closing documents to Owner, all final retainage shall be released.

d. No retainage shall be held on material only purchases.

11. Final Payment Within ten (10) days after Contractor notifies Owner that the Work is Substantially Complete, Owners shall inspect the Work with Contractor. Owner and Contractor shall create a comprehensive list of items to be completed or corrected prior to Final Payment (the "Punch List"). Contractor shall provide a detailed, line by line estimate of the cost to complete Punch List for Owners review and approval. The failure to include any item on the punch list does not relieve the Contractor of his responsibility to complete the construction in accordance with this Contract. Contractor shall be entitled to submit an Application for Payment to the Owner for final costs and retainage less the approved value of the Punch List. The Punch List and other Work shall be finished by Contractor within 30 days of the Punch List creation unless otherwise approved by Owner. Final Payment shall be due 15 days after Contractor (1) completes the Work in accordance with the Contract Documents: (2) provides Owner with final lien releases from Contractor and all subcontractors and suppliers, and provides all other closeout documents required. Such additional close out documents shall include a copy of Contractors and all subcontractor as-built drawings. Contractor has the responsibility to verify that such as-built drawings are accurate and have sufficient detail to allow Owners Architect to prepare a

OWNERS INITIALS DNV / WD CONTRACTOR INITIALS W

master set of as-built drawings encompassing all parts of the house.

12. Owners Liability Owner acknowledges that homes in the process of construction may be dangerous in their unfinished condition. Owner(s) agrees to refrain from any activities the performance of which would tend to hinder Contractor, its agents, or employees in erecting the contemplated structure. Owner may from time to time, with or without a Contractor representative, do a walk-thru of the project and may, at Owners option, be accompanied by Architect. Owner may at any time, in an effort to assure timely and satisfactory completion of the Project, mark with numbered blue tape or dots any area of concern. If unaccompanied by Contractor, Owner will promptly provide Contractor with a corresponding numbered list of such markings with a description of concern. Should Owner be accompanied by Contractor during such walk-thru no such list shall be required to be provided to Contractor. Owner agrees to accept full liability and responsibility for any injury or damages due to Owners presence on the construction site whether accompanied by Contractor or not except in the case of willful misconduct and/or gross negligence on the part of Contractor or its subcontractors.

13. Parking Contractor acknowledges there is adequate parking on the jobsite for all required construction vehicles. For all access to the work location preceding, during, and after the project, Contractor shall use normal and customary precautions to prevent damage to existing facilities, including landscaping, paving, roads, sidewalks, and gutters.

14. Construction Utilities Owner agrees to provide and pay for all power and water required by the Project, as well as any temporary facilities required in the absence of such utilities at the jobsite in order to deliver such utility services from an existing location to the points of intended use.

15. Acknowledgements Owner acknowledges that due to the inherent qualities of natural building supplies slight variations in color or pattern may occur. Contractor to provide samples of such natural materials to Owner for approval and acceptance. The Owner/Architect shall have the right to approve product selection as part of the specifications to be provided to Contractor. As part of the approved Project schedule, the Contractor will include a list of "long lead" items requiring Owner approval, and such approval date required in order for products to be delivered in a timeframe corresponding to the needs of the project schedule. Owner represents and warrants that since his or her purchase of the property, the premises has not been used for the manufacture or storage of dangerous chemicals, the presence of which would pose a health threat, however minimal, to the employees of Contractor.

OWNERS INITIALS DWW
GW

CONTRACTOR INITIALS W

16. Force Majeure Contractor shall not be liable for any delay due to force majeure events, including unnatural act or public enemy, or by labor dispute or trouble, strike, riot, vandalism, sabotage, expropriation or appropriation, flood or other weather related delays, war (whether declared or undeclared), accident when not caused by Contractor, storm, explosion, railroad embargo or congestion, government regulation or action, embargo or intervention, and whether the cause is or is not existing on the date of this Contract.

17. Warranty Contractor warrants, for a period of eighteen months from the date of final completion (the "Warranty Period"), that all work shall:

a. be in accordance with the Contract Documents,

b. free from material structural defects.

c. meet or exceed the requirements of the North Carolina Building Code

All product warranties are deemed assigned from Contractor to Owner. If a defect is discovered within the Warranty Period, Owner must promptly notify Contractor in writing of the discovery of the defect (the "Warranty Defect Notice") and must provide Contractor with an opportunity to inspect and an opportunity to either cure the defect in a manner satisfactory to the Owner or to pay the Owner the cost of the repair or replacement of the defect. Nothing contained in this section shall be construed to establish a period of limitation with respect to Contractor's other obligations under the Contract Documents.

18. Default & Damages

a. Owner Breach - Should Owner fail to pay any approved monies due within 14 days of the time required, Contractor may, upon providing seven (7) days written notice to Owner, suspend the Work until the amounts due have been received. Such amounts due shall not include any amounts under dispute between Owner and Contractor. If payment remains unpaid fourteen (14) days after the first written notice, Contractor may terminate the Contract. If payment of any bill is not received within thirty (30) days of the date of the bill, interest shall accrue on the unpaid balance at the rate of one and one-half percent per month (18% APR). Contractor shall also have the right to place a lien upon any real property where such products are installed as fixtures. In addition to Contractor's right to terminate for non-payment the Contractor may terminate for cause if the Owner breaches any material provision of the Contract Documents. Prior to terminating the Contract for cause under this Section, Contractor shall first provide Owner seven (7) days written notice of alleged breach. If Owner fails to cure the breach within seven (7) days of receipt of such notice, of fails to commence and diligently

OWNERS INITIALS DPW AW CONTRACTOR INITIALS VW

continue with cure efforts if the breach cannot be cured within seven (7) days, the Contractor may terminate the Contract. In this event there shall be due to Contractor all Project costs and expenses incurred through the termination date, including its margin as described in Paragraph 3 of this Contract.

b. Contractor Breach Owner may, after giving Contractor seven (7) days written notice and an opportunity to commence and continue to cure the alleged cause, terminate the contract if Contractor violates any material provision of this Contract or:

i. refuses or fails to supply enough properly skilled workers or proper materials to maintain project schedule: or

ii. fails to make payment to subcontractors for materials or labor in accordance with the respective agreements between Contractor and the subcontractors: or

iii. persistently disregards laws, ordinances, rules, regulation or orders of public authorities having jurisdiction; or

iiii. fails to provide Owner, upon request, reasonable evidence that the Work will be completed by the date of Substantial Completion.

When termination based on any of the above reasons occurs, Owner may, without prejudice to any other rights or remedies:

i. accept assignment of subcontracts;

ii. finish the Work using reasonable methods

19. Cure of Default & Enforcement In the event Owner fails to adhere to the agreed upon payment schedule per Paragraph 5 of this Contract or if Owner is in default per Paragraph 18 of this Contract and Contractor refers to its attorney the enforcement of this Contract, or any part hereof, for the collection of any monies due or to become due hereunder, Owner agrees to pay such reasonable attorney fees as incurred by Contractor. In the event Contractor is in default per Paragraph 18 of this Contract and Owner refers to its attorney the enforcement of this Contract, or any part hereof Contractor agrees to pay such reasonable attorney fees as incurred by Owner.

20. Safety Contractor and its subcontractors shall take all reasonably necessary safety precautions, including compliance with applicable laws, ordinances, regulations, and orders issued by a public authority, whether federal, state, or local. Contractor shall at all times be responsible for providing a safe job site and be responsible for the work performance and safety of all employees, personnel, equipment, and materials within the care, custody, or control of Contractor or its subcontractors of any tier. Contractor and its

OWNERS INITIALS DWW AW

CONTRACTOR INITIALS W

subcontractors shall furnish all required safety equipment and ensure all of its employees and lower-tier subcontractors' employees have and wear personal protective equipment in compliance with applicable safety requirements. Contractor shall promptly provide Owner with written notice of safety hazard(s) or violations(s) found on the job site or of any injury to it or its subcontractors' workers incurred on the job site.

21. Bankruptcy If voluntary bankruptcy proceedings are instituted by Owner or if Owner is adjudicated as a bankrupt insolvent, or if Owner makes an assignment for the benefit of its creditors, or if execution is issued against Owner, or if the interest of Owner hereunder passes by operation of law to any person other that Owner then, in any of such events, Contractor may, at its discretion, declare the Contract breached by notice mailed by certified mail and addressed to Owner at its last known address, provided that Contractor shall retain its lien and rights as to interest in the property, however situated, for any monies or payments due or to become due to Contractor pursuant to this Contract. If voluntary bankruptcy proceedings are instituted by Contractor or if Contractor is adjudicated a bankrupt insolvent, or if Contractor makes an assignment for the benefit of its creditors, or if execution is issued against Contractor, or if the interest of Contractor hereunder passes by operation of law to any person other that Contractor then, in any of such events, Owner may, at its discretion, declare the Contract breached by notice mailed by certified mail and addressed to Contractor at its last known address.

22. Indemnification Contractor agrees to defend, indemnify, and hold harmless Owner and its agents from and against claims, damages, losses and expenses, including but not limited to attorneys' fees and costs and expenses, arising out of or resulting from performance of the Work, provided that such claim , damage loss, or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself), provided, however, that the Contractor owes no Indemnity Duty if the Harm was caused by or results from the sole negligence of the Owner or its agents or both, and provided further that in the event of concurrent negligence (i) by Contractor or the Contractor's subcontractors agents, or employees, or both and (ii) by the Owner or its agents, or both, then the Contractor's Indemnity Duty is valid and enforceable only to the extent of the negligence of Contractor, its agents and its employees. Such indemnifications shall be limited to the value of insurance provided as per Paragraph 8.

23. Bailments & Storage In the event any items of Owner are placed in a storage location so that construction of the structure as contemplated by this Contract may be accomplished, Owner authorizes Contractor to place items in storage at the premises as needed for the completion of the construction. Such

OWNERS INITIALS JNW aw

CONTRACTOR INITIALS W

relocation, if deemed necessary, is performed as a courtesy to the Owner to mitigate damage to personal property in the construction process and is neither intended to create a situation of bailment nor a bailor-bailee relationship between the parties to this Contract.

24. Occupancy Owner shall not occupy the property until a certificate of occupancy is issued and final cleaning complete. The occupancy of the premises shall not interfere with or hinder Contractor in completing the project.

25. Venue This Contract is entered into in Watauga County, North Carolina, and shall be construed in accordance with the laws of the State of North Carolina. The parties hereby agree that Watauga County, North Carolina is an ~~the~~ exclusive venue for the resolution of any disputes arising as a result of this Contract.

26. Arbitration In the event a dispute arises under this Contract, Owner and Contractor agree to arbitrate the dispute in a binding arbitration proceeding. Any such arbitration shall be conducted by an arbitrator experienced in Construction. The parties reserve the right to object to any individual who shall be employed by or affiliated in any way with the competing party.

27. Assignment Neither Owner nor Contractor may assign, whether directly or indirectly, all or part of its rights or obligations under this Contract except by mutual agreement and with written consent of all parties to this Contract.

28. Integration This Contract represents the entire and integrated Contract of the parties and supersedes all prior negotiations, representations or Contracts, either written or oral. This Contract may only be amended by a written document duly executed by all parties. If any provision of this contract is unenforceable, invalid, or illegal, the remaining provisions will continue in full force and effect. The parties agree that both Owner and Contractor have had the opportunity to review and have had input into the terms and conditions of this contract, and that such terms reflect the agreement of the parties including the price term set forth. As a result of the integrated terms of this Contract, including the cost of construction, both parties agree that this contract shall not be construed against either party as draftsman.

29. Portfolio. Owner agrees that Contractor may take pictures of the property and structure as constructed by Contractor during construction and upon the conclusion of the work for the purposes of marketing and as

OWNERS INITIALS ~~DNW~~ AW

CONTRACTOR INITIALS W



Case 1:26-cv-00145-MR-WCM Document 9-2 Filed 08/03/26 Page 34 of 37

part of the portfolio of work performed by Contractor. The Contractor agrees to refrain from using the Owner's name and/or address in any way unless otherwise agreed to by Owner in writing. All such pictures and reproductions shall be the sole property of Contractor and may be used by Contractor, its successors or assigns, for such purposes as it deems appropriate without compensation to the Owner. Owner also agrees that, following the completion of construction, that Contractor may leave its signage in place upon the property for a period of three months following the completion of the work unless such signage is prohibited by local zoning ordinances.

Dated, signed, and executed by Contractor on this, the 23 day of June, 2017.

BY: [signature]

Matthew T. Vincent, Licensed General Contractor,
Member/Manager, CONTRACTOR

Dated, signed, and executed by Owner on this, the 26th day of June, 2017.

OWNERS: [signature]

Donald W. Wallace

[signature]

Erika R. Wallace

***FINAL PAGE OF CONTRACT***
(EXCEPT EXHIBITS A, B, & C ATTACHED HERETO)

OWNERS INITIALS DWW EW

CONTRACTOR INITIALS [initials]

VPC Builders
RESIDENTIAL AND COMMERCIAL

# EXHIBIT A: WORK TO BE PERFORMED

PROJECT: Don & Erika Wallace

LOCATION: Lot 63, Lodge Ridge Trail, Lodges at Eagles Nest, Banner Elk, NC 28604

BUILDING/STRUCTURE: New Construction

TYPE: Residential

WORK SPECIFICATIONS/MATERIALS TO BE USED:

Estimate based on plans by Hunter Coffey Architecture dated 12-23-16.

ANY ADDITIONAL DOCUMENTS THAT WOULD AID IN THE IDENTIFICATION OF THE PROPERTY TO BE CLEANED AND/OR RESTORED, OR ANY DOCUMENTS WHICH WOULD FURTHER DESCRIBE THE WORK TO BE PERFORMED, PLEASE ATTACH HERETO TO BE INITIALED BY BOTH PARTIES.

OWNER'S INITIALS DW EW



VPC BUILDERS, LLC. INITIALS W

VPC Builders
RESIDENTIAL AND COMMERCIAL

# EXHIBIT A: WORK TO BE PERFORMED

PROJECT: Don & Erika Wallace LOCATION: Lot 63, Lodge Ridge Trail, Lodges at Eagles Nest, Banner Elk, NC 28604

| LABORER OR WORKER: | STANDARD RATE OF COMPENSATION: | |
|---|---|---|
| 1. Charlie Day | $ 35 | PER Hour |
| 2. Ignacio Madrigal | $ 35 | PER Hour |
| 3. Laborers | $ 35 | PER Hour |
| 4. | $ | PER |
| 5. | $ | PER |
| 6. | $ | PER |

ANTICIPATED SUBCONTRACTORS
SUGGESTED/REQUESTED/AGREED UPON SUB

| | | |
|---|---|---|
| BRICK MASON/STONE MASON | Y/N | |
| PLUMBING SUBCONTRACTOR | Y/N | |
| ELECTRICAL SUBCONTRACTOR | Y/N | |
| GRADING/PAVING | Y/N | |
| LANDSCAPING | Y/N | |
| CARPENTRY/SPECIALIZED | Y/N | |
| WOODWORKING | Y/N | |
| HARDWOOD/TILE/SPECIALIZED | Y/N | |
| FLOORING | Y/N | |
| SEPTIC INSTALLATION | Y/N | |
| SITE WORK/IRRIGATION | Y/N | |
| OTHER:_______ | Y/N | |

OWNER'S INITIALS DW EW



VPC BUILDERS, LLC. INITIALS W