NORTH CAROLINA

GUILFORD COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24 CVS ______

24CV018396-400

| | | |
|---|---|---|
| WALTER PHARR and ANNA DELL PHARR, | ) | |
| Plaintiffs, | ) | COMPLAINT (JURY TRIAL DEMANDED) |
| v. | ) | |
| VPC BUILDERS, LLC, | ) | |
| Defendant. | ) | |

Plaintiffs, by and through their undersigned counsel, hereby alleges and says as follows:

## PARTIES AND JURISDICTION

1. Plaintiff Walter Pharr ("Mr. Pharr") is a citizen and resident of Guilford County, North Carolina.

2. Plaintiff Anna Dell Pharr ("Ms. Pharr") is a citizen and resident of Guilford County, North Carolina. Mr. Pharr and Ms. Pharr may be referred to, collectively, a "the Pharrs" or "Plaintiffs."

3. Plaintiffs are informed and believe and, thereupon, allege that VPC Builders, LLC ("VPC" or "Defendant") is a limited liability company organized and existing under and by virtue of the laws of North Carolina, and which has a principal place of business in Watauga County, North Carolina. VPC was formerly known as VPC, LLC.

4. The court has personal jurisdiction over the parties and subject matter jurisdiction.

5. Venue is proper in Guilford County, North Carolina, pursuant to N.C. Gen. Stat. § 1-82.

6. This action has been filed within all applicable statutes of limitation and/or repose.

7. All conditions precedent to the filing of this action and the claims herein have been satisfied, have been performed, have occurred, or have been waived.

## FACTUAL ALLEGATIONS

8. The Pharrs have lived a majority of their lives in Greensboro, North Carolina, where they have raised a family. Upon getting closer to retirement, the Pharrs searched for a mountain property to build a home to enjoy in retirement and allow for their adult children to visit. The Pharrs chose a property in Banner Elk, North Carolina, for their new home.

9. At all relevant times to the allegations in this Complaint, the Pharrs have been the fee simple owners of 146 Big Rock Road, in Banner Elk, North Carolina (the "Property").

10. The Pharrs chose to construction their retirement family home (the "Home") at the Property.

11. The Pharrs met with various builders, including representatives of VPC in 2018 to discuss the Home, during which time VPC represented to the Pharrs VPC's superior capabilities to construct projects like the Pharr's Home, including the design of such projects. The Pharrs, based upon representations from VPC about VPC's superior quality and workmanship chose VPC to be the builder to construct the Home.

12. On or about April 10, 2018, the Pharrs signed VPC's Design Contract, pursuant to which VPC agreed to create a set of customer design plans for the Home, as well as provide other associated work throughout the design process.

13. A true and accurate copy of the Design Contract is attached hereto as Exhibit A.

14. In November of 2018, VPC presented the Pharrs with the designs for the Home.

15. Subsequently, on or about February 1, 2019, the Pharrs signed a Proposal from VPC for the construction of the Home pursuant to the designs provided by VPC. The base price from VPC for the Project pursuant to the Proposal was $998,594.00.

16. A true and accurate copy of the Proposal is also attached hereto as Exhibit A.

17. The Design Contract and the Proposal are referred to, collectively, as the "VPC Contract."

18. Subsequently, VPC constructed the Home, and the Pharrs paid VPC in full pursuant to the CPV Contract.

19. Shortly after completion of the Home and payment to VPC, the Home experienced events of water intrusion. Subsequent inspection by the Pharrs revealed that the walls and insulation of multiple rooms were saturated.

20. The Pharrs provided VPC with all information available from their investigations of the construction defects at the Home, and allowed VPC to have representatives present during such investigations.

21. Included in the investigation, a professional engineer inspected the Home and identified numerous construction defects in VPC's workmanship. On May 14, 2024, J. Drew Wilkie, P.E., issued a Report of Construction Deficiencies, which was provided to VPC and is incorporated herein by reference. A true and accurate copy of the May 14, 2024 J. Drew Wilkie, P.E. Report is attached as Exhibit B.

22. The construction defects arise from the failure of VPC to construct and/or supervise the construction work performed by its subcontractors, the result being that, among other things, the work was not performed or completed in accordance with the VPC Contract; work was not performed in a good and workmanlike manner, free of major defects and

deficiencies, or in accordance with industry standards; work was not performed or completed in accordance with industry standards; work was performed in a deficient, defective and incomplete manner, resulting in serious damage and losses to the Property and Home; and work was not completed in accordance with the North Carolina Code. Defects in the construction of the Home include, but are not limited to:

(a) Lack of flashing at the base of exterior siding;

(b) Heavy fillet bead sealant along intersections of the base of siding and face of foundation walls

(c) Insufficient stucco covering;

(d) Corners of siding pieces are not sealed or mechanically connected;

(e) Overdriven sheathing nails;

(f) Flashing materials are not arranged to include proper kickout flashing;

(g) Wood framing products are positioned below-grade concrete;

(h) Missing flashing from windows;

(i) Window heads sealed shut;

(j) Sill flashing taped shut; and

(k) Reverse lapping at windows.

23. VPC failed to provide code-required and manufacturer-required flashings and clearances to allow for water and moisture to be redirected and drained away from the Home's structure.

24. The Home exhibits damages including, but not limited to, wet sheathing, insulation, and drywall, rotting framing and sheathing, and other life safety concerns for ongoing damages including the Home's structural components.

25. The primary cause of the damages are defects in the construction of the building envelope of the Home.

26. Upon information and belief, VPC deviated in many respects from its own designs for the Home.

27. As a result of the construction defects at the Home, the Home itself has experienced significant damages from water and moisture intrusion and other factors caused by the defective construction.

28. The Pharrs are informed and believe that the defects continue to manifest themselves, and that additional defects, related damages and additional causes may be discovered as the Pharrs' investigation continues.

29. VPC owed a duty to design, construct, and/or supervise the construction of the Home in accordance with the North Carolina Building Code ("Code").

30. The Code imposes liability on any person who designs, constructs, or supervises the construction of a structure and who violates the Code such that the violation proximately causes injury or damage.

31. The Code has the force of law and a violation of the Code constitutes negligence *per se*.

32. The Code governs the manner in which the work was supposed be installed at the Property.

33. The Code was enacted to protect owners of real property, including Plaintiffs, from conditions that pose hazards.

34. Plaintiffs, as the owners of the Property and Home, are within the class of persons who would be foreseeably harmed if the Home was not constructed in a good and workmanlike manner, in accordance with the Code, and in accordance with the designs and the product manufacturers' recommendations.

35. Despite being paid in full, and subsequently being provided all information regarding the numerous construction defects and opportunities to repair the defective construction, VPC has failed and refused to acknowledge the defects and remedy such damages.

36. As of the date of this Complaint, VPC has failed and refused to correct the defective construction at the Home.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract / Express Warranty)**

37. The allegations contained in paragraphs 1 through 36 of the Complaint are realleged and incorporated herein by reference.

38. The VPC Contract is a valid and enforceable contract between the Pharrs and VPC.

39. In the VPC Contract, VPC warranted that "all work shall meet or exceed the requirements of the North Carolina Building Code."

40. VPC materially breached the VPC Contract when it constructed the Home in violation of the Code and otherwise failed to construct the Home without the defects as alleged herein and identified by Mr. Wilkie, P.E., in the attached Exhibit B, and as will otherwise be identified through ongoing investigation.

41. Accordingly, as a proximate and foreseeable result of VPC's breach(es) of the VPC Contract, the Pharrs have suffered damages and will continue to suffer damages including, without limitation, costs to investigate and evaluate the defects and damage, costs to repair and/or correct the defects and damage, and other damages totaling in excess of $25,000, said amount to be proven at the trial of this matter.

## SECOND CLAIM FOR RELIEF
**(Breach of Implied Warranty of Workmanlike Construction Against VPC)**

42. Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 41 of this Complaint as though fully set forth herein.

43. Pursuant to the VPC Contract and by undertaking to construct the Home, VPC warranted, on an implied basis, that the construction would be done in a good and workmanlike manner, free of structural defects, in conformity with the designs, and in accordance with industry standards.

44. VPC breached the implied warranty of workmanlike construction when it constructed the Home with the defects identified above and will otherwise be discovered through further investigation that is ongoing.

45. As a proximate result of the acts and omissions of VPC and its breach of the implied warranty of workman-like construction, the Pharrs have suffered damages and will continue to suffer direct damages including, without limitation, costs to investigate and evaluate the defects and damage, costs to repair and/or correct the defects and damage, and other damages totaling in excess of $25,000, said amount to be proven at the trial of this matter.

## THIRD CLAIM FOR RELIEF
**(Breach of Implied Warranty of Habitability Against VPC)**

46. Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 45 of this Complaint as though fully set forth herein.

47. Pursuant to the VPC Contract and by undertaking to construct the Home, VPC warranted, on an implied basis, that the construction would be sufficiently free from major structural defects, and constructed in a workmanlike manner, so as to meet the standard of workmanlike quality prevailing at the time of construction.

48. VPC is liable to the Pharrs for failing to construct the new Home sufficiently free from major structural defects, and constructed in a workmanlike manner, so as to meet the standard of workmanlike quality prevailing at the time of construction.

49. VPC breached the warranty of habitability when it constructed the Home with the defects identified above and will otherwise be discovered through further investigation that is ongoing.

50. As a proximate result of the acts and omissions of VPC and its breach of the implied warranty of habitability, the Pharrs have suffered damages and will continue to suffer direct damages including, without limitation, costs to investigate and evaluate the defects and damage, costs to repair and/or correct the defects and damage, and other damages totaling in excess of $25,000, said amount to be proven at the trial of this matter.

**FOURTH CLAIM FOR RELIEF**
**(Negligence)**

51. The allegations contained in paragraphs 1 through 50 of this Complaint are realleged and incorporated herein by reference as if fully set forth.

52. VPC held itself out as a design professional in the Design Contract, promising to create a set of design plans for the Home.

53. Upon information and belief, VPC holds no professional license as an architect or an engineer, but by virtue of entering into the Design Contract it assumed duties to the Pharrs to designs the Home with the standard of care of a professional designer and/or other residential home designers.

54. Pursuant to the Design Contract VPC had duties to the Pharrs to exercise reasonable and/or professional skill, care, and diligence in providing architectural, engineering, and other design services to the Pharrs for the Home.

55. VPC negligently breached its duty of care to the Pharrs when it furnished designs that failed to meet the Code and/or permitted the water intrusion at the Home.

56. Reasonable professionals (or entities holding themselves out to provide design services) in VPC's position would have known that these requirements existed and included them in the Designs for the Home.

57. As a proximate and foreseeable result of VPC's negligence, the Pharrs have suffered damages in an amount to be proven at trial in excess of $25,000.

WHEREFORE, the Plaintiffs respectfully request:

1. That the Court enter Judgment against VPC on the claims and for the relief alleged in this Complaint;

2. That Plaintiffs have and recover of VPC compensatory damages for its breach of the VPC Contract and warranties in an amount to be proven at trial in excess of $25,000;

3. That Plaintiffs have and recover of VPC compensatory damages for its professional negligence in an amount to be proven at trial in excess of $25,000;

4. That the Court award Plaintiffs pre-judgment and post-judgment interest as provided by law;

5. That the Court award Plaintiffs their attorneys' fees and costs to the maximum extent permitted by contract and/or law;

6. That Plaintiffs have a trial by jury on all claims; and

7. That the Court award such other and further relief as it deems just and proper.

This the 15th day of August 2024.

Brett M. Becker
N.C. State Bar No. 51718
bbecker@maynardnexsen.com

*Attorneys for Plaintiffs*

OF COUNSEL:
MAYNARD NEXSEN PC
800 Green Valley Road, Suite 500
Post Office Box 3463
Greensboro, NC 27402
(336) 373-1600

# EXHIBIT A

VPC | Builders
RESIDENTIAL AND COMMERCIAL

# DESIGN CONTRACT

THIS DESIGN AGREEMENT, by and between VPC BUILDERS, LLC, a NORTH CAROLINA LIMITED LIABILITY COMPANY (hereinafter VPC BUILDERS, LLC) and Walter & Anna Dell Phar (hereinafter Owner or Owners. The parties signing the Agreement for VPC BUILDERS, LLC and Owner(s) warrant that each of them is fully authorized by their respective parties to execute and deliver the Agreement in accordance with the terms and conditions contained herein. Owner further warrants that he has authority to sign on behalf of all owners of the subject property.

FOR AND IN CONSIDERATION of the provisions undertaken and contained herein, VPC BUILDERS, LLC and Owner(s) agree as follows:

1. Scope of the Work: VPC BUILDERS, LLC agrees to work with the Owner(s), VPC BUILDERS, LLC's design draftsmen, and other individuals to create a set of custom design plans for the intent of construction of a house as the parties may contract and agree to build at a later date. VPC BUILDERS, LLC agrees to assist the Owner(s) in the development and preparation of a structure and agrees to consult with design rural, civil, structural, mechanical, electrical, or other systems as VPC BUILDERS, LLC deems needful or necessary.

2. VPC BUILDERS, LLC agrees that it will charge the Owner(s) a fee of $10,000 as an estimate of expenses for VPC BUILDERS, LLC's services related to the consultation, recommendations, advice, and other input into the proposed custom plans and design. In addition to the above amount, which represents an estimated fee to VPC BUILDERS, LLC for its work in the design process, Owner(s) agrees to reimburse VPC BUILDERS, LLC for all costs and expenses associated with design draftsmen and related engineering review as may be required for the completion of the Contract. Payment shall be due within thirty days of presentation of an invoice for reimbursement for these expenses. Costs of VPC BUILDERS, LLC's work in the design process shall include, but not be limited to: the costs of materials, cost of labor, insurance, payroll taxes of employees, transportation costs, administrative expenses, utility costs, and overhead of VPC BUILDERS, LLC related to or attributable to the project. Owner(s) agrees to be forthcoming and specific about all their needs for the design plans and shall take full responsibility for completely knowing and articulating its needs to VPC BUILDERS, LLC before VPC BUILDERS, LLC begins work on formulating design plans. In the event the Owner(s) request VPC BUILDERS, LLC to design, redesign, change, alter, amend, or add to the design plans after VPC BUILDERS, LLC has begun formulating design plans, or in the event that VPC BUILDERS, LLC, in its sole discretion, deems that Owner(s) has taken an undue amount of time in providing or specifying its needs, the Owner(s) agrees to further compensate VPC BUILDERS, LLC at the rate of

OWNER INITIALS ______ VPC BUILDERS, LLC. INITIALS MV

N/A for such work as well as to pay all costs for such work, including costs as set forth above. Such request on the part of the Owner(s) for redesign, change, alteration, amendment, or addition shall be deemed accepted only upon Contractor's agreement to do such additional work.

3. Owner(s) agrees to be forthcoming and specific about all its needs for the design plans and shall take full responsibility for completely knowing and articulating its needs to VPC BUILDERS, LLC before VPC BUILDERS, LLC begins work on formulating design plans. In the event the Owner(s) request VPC BUILDERS, LLC to design, redesign, change, alter, amend, or add to the design plans after VPC BUILDERS, LLC has begun formulating design plans, the Owner(s) agrees to further compensate VPC BUILDERS, LLC at its regular rates for such work as well as to pay all costs for such work.

4. Initial Payment Owner(s) and VPC BUILDERS, LLC acknowledge that the Owner(s) will pay a non-refundable sum of 50% dollars ($5,000.00), upon the execution of this contract and before design work or consultations begin as a deposit and part of the purchase price of the project as described above.

5. All designs, drawings, plans, specifications, and other documents relating to the design, construction, assemblage, and installation of the work, including, without limitation, any patents or pending patents or licenses relating to same and all other documentation are Proprietary information belonging to VPC BUILDERS, LLC or its suppliers. Owner(s) shall exercise all due care to protect the confidentiality of the Proprietary Information. Should any of the Proprietary Information be used by any party without the express written authorization of VPC BUILDERS, LLC, including work which is incomplete or unfinished, or which are subsequently changed, corrected, or amended, such use is an express breach of contract and would entitle VPC BUILDERS, LLC to damages as set forth herein. Moreover, Owner(s) agrees that, in the event of such unauthorized use of the Proprietary Information, Owner(s) will indemnify, defend, and hold harmless VPC BUILDERS, LLC from any and all claims, losses, or liabilities, including attorneys' fees, related to the subsequent use of the Proprietary Information.

6. <u>Default and Damages:</u> In the event Owner(s) shall fail to pay any payment due herein, VPC BUILDERS, LLC may cease work without breach pending payment or resolution of any dispute. The parties hereto acknowledge and agree that, due to the difficulty in calculating damages from wrongful use of the Proprietary Information of VPC BUILDERS, LLC, liquidated damages are an appropriate remedy for VPC BUILDERS, LLC Specifically, the parties agree that, in the event Owner(s) employs another contractor to build a structure for Owner(s) using any part of the

OWNER INITIALS ______ VPC BUILDERS, LLC. INITIALS MV

plans prepared by VPC BUILDERS, LLC, VPC BUILDERS, LLC shall be entitled to collect from Owner(s), as liquidated damages, an amount equal to twenty percent of the total construction cost of the project built using the designs of VPC BUILDERS, LLC. In the event of breach by Owner(s), if payment is not received within thirty days of the date of invoice, interest shall accrue on the unpaid balance at the rate of one and one half percent per month (18% APR). VPC BUILDERS, LLC shall also have the right to place a lien upon the real property owned by the Owner(s). In the event of breach by VPC BUILDERS, LLC, Owner(s) hereby waives any claims for incidental or consequential damages which may be incurred by Owner(s). Owner(s) represents and warrants that he is the owner of such real property, or that he is an authorized agent of the owner of said real estate with authority to act upon the Owner's behalf. If VPC BUILDERS, LLC has to employ, hire and/or retain legal counsel to enforce this agreement and VPC BUILDERS, LLC prevails by obtaining at least half the amount they sought as damages then the Owner shall be pay VPC BUILDERS, LLC's reasonable attorney's fees.

7. VPC BUILDERS, LLC shall not be liable to Owner(s) for any acts or omissions of any engineer who shall review the plans and design specifications contemplated by this contract. The parties specifically agree that VPC BUILDERS, LLC shall not be liable for the negligence of any engineer in the design, approval, review, or other failure which has been approved by a licensed engineer.

8. The obligations of either party under this Agreement that are of a continuing nature shall survive termination of this Agreement or final completion of the Project, unless otherwise explicitly agreed to in writing.

9. <u>Venue:</u> This Agreement is entered into in Watauga County, North Carolina and shall be construed in accordance with the laws of the State of North Carolina. The parties hereby agree that Watauga County, North Carolina is an appropriate venue for the resolution of any disputes arising as a result of this contract.

10. <u>Assignment:</u> Owner(s) may not assign, directly or indirectly, all or part of its rights or obligations under this Agreement except by mutual agreement and with written consent of all parties to this Agreement.

11. <u>Integration:</u> This agreement represents the entire and integrated agreement of the parties and supersedes all prior negotiations, representations, or agreements, either written or oral. This agreement may be amended by a written document duly executed by all parties. If any provision of this contract is unenforceable, invalid, or illegal, the remaining provisions will continue in full force and effect.

OWNER INITIALS ______ VPC BUILDERS, LLC. INITIALS MV

12. The parties agree that both Owner and VPC BUILDERS, LLC have had the opportunity to review and have had input into the terms and conditions of this contract, and that such terms reflect the agreement of the parties including the price term set forth. As a result of the integrated terms of this Agreement, including the cost of construction, both parties agree that this contract shall not be construed against either party as draftsman.

Dated, signed, and executed by VPC BUILDERS, LLC. on this, the 10 day of APRIL, 20 16.

BY: [signature]
Matthew T. Vincent, Licensed General Contractor,
Member/Manager, VPC BUILDERS, LLC

Dated, signed, and executed by Owner on this, the 10 day of APR, 20 17.

OWNER(S): [signature]
[signature]

VPC Builders RESIDENTIAL AND COMMERCIAL

2059 Tynecastle Highway • Banner Elk, NC 28604 • Phone: 828.295.0707 •
Fax: 828.832.3882

Ann Pharr

Lot 62 Big Rock Road
Banner Elk, NC 28604

**Print-date:** 12-28-2018

This estimate is based on building a carport with gravel base, no garage is included.
No paving is included. Driveway to be ABC gravel.
No POA or Impact Fees are included if required.
No clearing of trees outside of house footprint.
Rock Clause -- If we encounter rock that can not be moved with the equipment on site and has to be drilled and/or blasted there will be additional charges.
Estimate is based on being able to use owners barnwood. No barnwood materials are included in this proposal.
Interior beams are based on being able to use owners reclaimed wood.
No landscaping is included in this proposal.
No sidewalks or steps are included in this proposal, they are called out to be designed on site.
No driveway retaining walls are included.
No photovoltaic panels or equipment is included in this proposal, we would need more information to quote this.
Options are not part of the base bid.
Basement floor to be plain concrete.

**INITIAL PAYMENT.** A non-refundable sum of 15% is due upon the execution of this contract and before construction can be scheduled as a deposit and part of the purchase price of the project as described in this proposal.

**Pricing Valid for 30 days from Date of Quotation**

## Price Breakdown

### Base Price

**Group Price: $998,594.00**

Base Price

| Code | Description | Price |
|---|---|---|
| 31 01 02 - Grading | | $33,795.00 |
| 02 01 08 - Footings and Foundations Demolition | Poured in place foundation. | $72,875.00 |
| 03 04 05 - Slab on Grade | Includes basement and patio slabs. | $47,190.00 |
| 07 03 02 - Cementitious Waterproofing | | $5,122.00 |
| 06 02 03 - Rough Framing | | $95,825.00 |
| 07 06 10 - Steel Roof Panels | Metal Roof. Does Not Include Ice Guards. | $21,850.00 |
| 08 04 03 - Metal Clad Wood Windows | | $34,120.00 |
| 07 08 04 - Fiber Cement Siding | | $84,027.00 |
| 06 02 04 - Timber Framing | Timber Framing Allowance Installed. Labor only for reclaimed timbers and beams. No reclaimed beam or timber materials are included in estmate. We do include the beams on the porch area only. | $35,000.00 |
| 26 01 01 - Electrical | Electrical Allowance Installed. | $30,500.00 |
| 26 01 02 - Light Fixtures | Light Fixtures Allowance Installed | $5,000.00 |
| 22 01 01 - Plumbing | | $19,500.00 |
| 22 01 02 - Plumbing Fixtures | Plumbing Fixtures Allowance Installed. Includes Water Heater. | $10,500.00 |

| | | |
|---|---|---|
| 33 01 04 - Gas Piping, Gas Tank | Gas Lines Allowance Installed | $6,500.00 |
| 23 01 01 - HVAC | 15 SEER Heat Pump | $22,750.00 |
| 07 04 02 - Blanket Insulation | Batt Insulation | $9,470.00 |
| 09 06 01 - Gypsum Board | | $22,840.00 |
| 09 15 01 - Exterior Painting | | $12,900.00 |
| 09 15 02 - Interior Painting | | $16,900.00 |
| 06 03 01 - Base, Case, Crown Moldings, T+G | Interior Trim Work | $29,230.00 |
| 08 01 04 - Wood Doors | Interior Doors and Hardware Allowance Installed. | $12,000.00 |
| 09 07 04 - Thin Set Ceramic Tiling | Tile Allowance Installed | $16,500.00 |
| 09 11 01 - Wood Flooring | Hardwood Flooring Allowance Installed | $13,500.00 |
| 12 02 01 - Manufactured Wood Casework | Cabinet Allowance Installed | $22,500.00 |
| 12 02 07 - Stone Countertops | Countertops Allowance Installed | $10,000.00 |
| 11 04 01 - Residential Appliances | Appliances Allowance Installed. | $9,500.00 |
| 04 04 04 - Stone Masonry | Stone Masonry where called for. | $31,550.00 |
| 10 07 01 - Manufactured Fireplaces | Fireplace Allowance Installed. Includes Gas Logs and Chimney caps. | $14,250.00 |
| 06 06 01 - Fireplace Mantels | Fireplace Mantels Allowance Installed | $1,800.00 |
| 06 05 02 - Wood Railing | Interior Handrails Allowance Installed | $7,500.00 |
| 06 05 01 - Stair Framing | Stair Allowance Installed. Includes Treads. | $25,000.00 |
| 10 06 01 - Toilet Accessories | Bathroom Accessories Allowance Installed | $500.00 |
| 08 05 02 - Mirrors | Mirrors Allowance Installed | $1,000.00 |
| 10 13 02 - Closet and Utility Shelving | Closet Shelving Allowance Installed | $4,500.00 |
| 07 10 01 - Downspouts and Gutters | Gutters Allowance Installed | $3,200.00 |
| 01 03 05 - Insurance | Builders Risk Insurance. (Required) | $5,500.00 |
| 31 01 05 - Soil Treatment | | $1,100.00 |
| 01 04 01 - Permit Fees | | $2,800.00 |
| 01 06 04 - Temporary Toilet | | $1,200.00 |
| 08 01 12 - Crawl Space Doors | Crawl Space Door Allowance Installed. | $1,200.00 |
| 05 06 02 - Metal Ladders | Attic Access Ladder Allowance Installed. | $1,200.00 |
| 10 06 03 - Tub and Shower Enclosures | Shower Doors Allowance Installed | $5,000.00 |
| 01 12 02 - Surveying | | $2,800.00 |
| 01 13 02 - Construction Dumpster / Fees | | $12,500.00 |
| 01 06 02 - Temporary Power | | $3,500.00 |
| 01 13 01 - Final Cleaning | | $4,500.00 |

| | | |
|---|---|---|
| 33 01 02 - Sanitary Sewerage | Septic System Allowance Installed. | $9,250.00 |
| 01 03 07 Project Management | | $48,500.00 |
| 01 03 08 Markup | Overhead and Profit | $130,350.00 |

## Stained Concrete Option ✓

**Group Price: $10,925.00**

| Code | Description | Price |
|---|---|---|
| 09 10 01 - Concrete Floor Staining | Concrete Floor Staining Allowance Installed Option. This is for the basement only. | $10,925.00 |

## Sealed Crawl Space Option

**Group Price: $5,923.00**

| Code | Description | Price |
|---|---|---|
| 07 13 01 Sealed Crawl Space | Sealed Crawl Space Installed Option | $5,923.00 |

## Foam Insulation Option ✓

**Group Price: $11,575.00**

| Code | Description | Price |
|---|---|---|
| 07 04 05 - Sprayed Insulation | Open Cell Foam Insulation Installed Option. | $11,575.00 |

## Snow and Ice Guards ✓

**Group Price: $2,350.00**

| Code | Description | Price |
|---|---|---|
| 07 10 06 - Snow Guards | Snow and Ice Guards Allowance Installed. | $2,350.00 |

## Gutter Guards ✓

**Group Price: $2,400.00**

| Code | Description | Price |
|---|---|---|
| 07 10 02 - Gutter Guard | Gutter Guards Allowance Installed. | $2,400.00 |

## Garage ✓

**Group Price: $23,401.00**

| Code | Description | Price |
|---|---|---|
| 01 03 01 - General Purpose Labor | This is the cost to turn carport into garage. Includes slab work, siding, overhead door, framing, drywall, and painting. | $23,401.00 |

1,099,245

dep. 157,386.75

## We Accept Credit Cards with a 3.5% Processing Fee

### TERMS AND CONDITIONS

1. DEFINITION. VPC, LLC is a North Carolina corporation engaged in the building and construction business; and whereas, the Client (s) is desirous of retaining the services of VPC. LLC as contemplated by this agreement, now witnesseth, based on the mutual covenants and considerations contained herein, the parties hereby contracts as hereinafter described.
2. SCOPE OF WORK. VPC, LLC shall furnish materials and perform work as specified by this contract, except as modified by written or oral agreement of the parties, to be performed on the referenced property. Specifically, VPC LLC agrees to perform the following work upon the subject property as set forth on the contract, subject to the scope and limitations contained herein. In the absence of such list of work to be performed under this contract, the scope of the work to be undertaken by VPC, LLC shall be any tasks directly or indirectly related to the construction, building, erecting, and raising of a structure upon client property as designated by the construction documents, building schedules, or change orders, within VPC, LLC agents and officers understanding of the work to be done and subject to acceptance of the project by VPC, LLC.
3. COMMENCEMENT & SUBSTANTIAL COMPLETION. Work shall commence upon the obtainment of a building permit, or shortly thereafter. Construction time through substantial completion shall not be fixed, but will be completed in a timely fashion. Not including delays and adjustments for delays caused by reason of holiday, inclement weather, accidents, labor or material shortages, additional time required for work performed pursuant to change orders, or other unavoidable delays or delays beyond the control of VPC, LLC.
4. CONTRACT PRICE. In consideration for the material and labor above described, the Client(s) shall pay VPC. LLC the fixed sum mentioned above for all costs incurred in the construction, building, and installation as well as VPC, LLC costs for labor, subject to additions and deductions pursuant to oral or written change orders. Payment shall be due upon completion. In the event the Client(s) request VPC, LLC to construct, build, erect, install or otherwise act beyond the scope of the items set forth, Client(s) agrees to further compensate VPC, LLC at its regular rates for such work. Such additions shall be deemed accepted only upon Contractor agreement to do such additional work. In the event VPC, LLC encounters any unforeseen obstacles, difficulties, or circumstances not contemplated on the contract, VPC LLC shall be entitled to compensation for such additional work at its regular rates. Notwithstanding the fixed cost nature of this contract, any additional costs incurred by VPC, LLC related to grading, the

foundation, rock blasting, or excavating which exceed the amount set forth for such items in the contract shall entitle VPC, LLC to compensation for such additional expense. The parties acknowledge that due to the mountainous terrain of this area that subsoil conditions contain many unknown factors and any additional costs for such actions shall entitle VPC, LLC to compensation for services. Such costs shall be considered as an approved change order by the parties.

**5. CHANGE ORDERS.** Client(s) and VPC, LLC acknowledge that change orders may be necessary to accomplish the construction of the structure as contemplated under this Agreement. Under such circumstances as a change order is deemed necessary by the parties, said change order may be verbally or in writing. Proposals for changes in the work must be delivered to the VPC, LLC General Contractor in charge of this construction project as detailed under this Agreement. Proposals for changes in the work provided only to the construction foreman will not be deemed delivered. VPC, LLC General Contractor is the only party authorized to approve a change order under the agreement.

**6. TIME FOR PERFORMANCE.** The parties agree that time is not of the essence in the completion of construction described in this contract. All parties shall act to complete the construction described within a reasonable time.

**7. INSURANCE.** Client(s) will keep in force a Builders Risk Insurance Policy on the property as a means of protecting both Client(s) and VPC, LLC interests until the completion of construction. The Client(s) will purchase and maintain property insurance to the full insurance value of the project as protection against fire, vandalism, malicious mischief, or other forms of property damage that may occur.

**8. SUBCONTRACTORS.** Contractor may at its discretion engage subcontractors as may be necessary to perform under said agreement. Owner agrees to have no contact with any subcontractors except and unless with the express written permission of Contractor.

**9. HINDRANCE.** As structures in the process of construction may be dangerous in their unfinished condition, Owner(s) shall agree to refrain from any activities the performance of which would tend to hinder VPC, LLC., its agents, or employees in erecting the contemplated structure. This covenant is made in the interest of protecting persons from injury and ensuring that VPC, LLC. is not stymied or impeded in its objectives. Inasmuch as the Owner(s) may wish to continue with regularly-conducted activity in and around the property and desires to assist with the labor of construction, VPC, LLC. advises Owner(s), and Owner agrees, to remain as clear as possible from the areas in and around the construction by VPC, LLC., unless instructed otherwise by the general contractor.

**10. PARKING.** Owner agrees to provide adequate parking for VPC, LLC. vehicles and all access as necessitated by the nature of the construction work to be performed in the course of the project. Parking for construction vehicles, trucks and other equipment of VPC, LLC shall be accommodated by Owner, except and unless parties agree otherwise to an alternate arrangement. For all access to the work location proceeding, during, and after the project, Contractor shall bear no responsibility for repair or replacement of existing facilities, including landscaping, paving, roads, sidewalks, and gutters.

**11. CONSTRUCTION UTILITIES.** Owner agrees to provide and pay for all power and water required by the project, as well as any temporary facilities required in the absence of such utilities at the jobsite in order to deliver such utility services from an existing location to the points of intended use.

**12. ACKNOWLEDGEMENTS.** Owner acknowledges that due to the inherent qualities of natural building supplies, VPC, LLC cannot guarantee a particular pattern or specific coloration for any custom products. VPC, LLC can neither guarantee a certain part, piece of hardware, type of equipment, style or design of material will be available at any given time. Owner also acknowledges that VPC, LLC may encounter delays from suppliers which are beyond its control, and that some jobs may experience periods of delays. Owner represents and warrants that since his or her purchase of the property, the premises has not been used for the manufacture or storage of dangerous chemicals, the presence of which would pose a health threat, however minimal, to the employees of VPC, LLC. Owner affirmatively states that there are no items of machinery or storage tanks on the premises which would emit noxious or combustible gases, including carbon monoxide, nitrogen dioxide, or any other poisonous chemical compound.

**13. FORCE MAJEURE.** VPC, LLC. shall not be liable for any delay due to circumstances beyond its control or force majeure, including unnatural act or public enemy, or by labor dispute or trouble, strike, riot, vandalism, sabotage, expropriation or appropriation, flood, war (whether declared or undeclared), accident when not caused by VPC, LLC., storm, explosion, breakdown of machinery, fuel shortage, power shortage, railroad embargo or congestion, government regulation or action, embargo or intervention, failure or delay of manufacturers or persons from whom VPC, LLC. is obtaining machinery, equipment, materials, or supplies to deliver the same, or other cause beyond its control, whether such other cause be of the classes herein specifically provided for or not, and whether the cause is or is not existing on the date of this Agreement.

**14. WARRANTY.** VPC, LLC warrants, for a period of one year, that all work shall meet or exceed the requirements of the North Carolina Building Code. Other than this warranty, VPC, LLC makes no express warranties and no warranties of fitness for a particular purpose herein or within any other clause of this Agreement.

**15. DEFAULT & DAMAGES.** In the event Owner shall fail to pay any payment due herein, VPC, LLC may cease work without breach pending payment or resolution of any dispute. Specifically, should Owner fail to pay any monies due or to become due hereunder or should Owner fail to comply with any of its other obligations under this Agreement within fifteen (15) days from the mailing to Owner of notice of such default, VPC, LLC. shall have the right, at its option to terminate the Agreement in which event there shall be due to VPC, LLC., as liquidated damages, a sum equal to the amount of one-half of the amount of one-phase of the project, or one-eighth (1/8) of the total project, whichever is greater. VPC, LLC. may elect instead to accelerate all monies due for the unexpired remaining term of the within Agreement and to declare the same immediately due and payable. The parties hereto acknowledge and agree that, due to the difficulty in calculating lost profits and damages to the Contractor in the event of breach by the Owner, liquidated damages are an appropriate remedy for Contractor. In the alternative, and if neither liquidated damages nor acceleration options are chosen in the event of breach, VPC, LLC reserves the right to sue for monies due under this contract in intervals or as the same accrue. If payment is not received within thirty (30) days of the date of the bill, interest shall accrue on the unpaid balance at the rate of one and one-half percent per month (18% APR). VPC, LLC shall also have the right to place a lien upon any real property where such products are installed as fixtures. In the event of breach by Contractor, Owner hereby waives any claims for incidental or consequential damages which may be incurred by Owner.

**16. CURE OF DEFAULT & ENFORCEMENT.** If Owner has commenced by reasonable means to cure any default not curable in fifteen (15) days, such additional time as is reasonably necessary to cure such default may be granted to Owner before Owner as adjudged in default hereunder. Contractor's failure to strictly and promptly enforce these conditions shall not operate as a waiver of Contractor rights hereunder. Contractor hereby reserves the right to enforce prompt payment of fees or other charges, or to declare the contract breached regardless of any indulgences, or extensions previously granted to Owner. In the event Owner defaults in the performance of any of the terms, covenants, agreements, or conditions provided herein and VPC, LLC refers to its attorney the enforcement of this Agreement, or any part hereof, for the collection of any monies due or to become due hereunder, Owner agrees to pay such reasonable attorney fees as incurred by VPC, LLC.

**17. BANKRUPCTY.** If voluntary bankruptcy proceedings are instituted by Owner or if Owner is adjudicated a bankrupt insolvent, or if Owner makes an assignment for the benefit of its creditors, or if execution is issued against Owner, or if the interest of Owner hereunder passes by operation of law to any person other that Owner then, in any of such events, VPC, LLC. may, at its discretion, declare the Agreement breached by notice mailed by certified mail and addressed to Owner at its last known address, provided that VPC, LLC. shall retain its lien and rights as to interest in the property, however situated, for any monies or payments due or to become due to VPC, LLC. pursuant to this Agreement.

**18. IMPRACTICABILITY.** It is stipulated that the estimates specified herein or in the attached schedules are based upon VPC, LLC cost of operation and construction necessary to comply with governmental laws, rules and regulations as presently enforced. If during the term of this Agreement, there should occur a change in policy affecting enforcement of said laws, rules and regulations, whether federal, state, or of local character, or if VPC, LLC should incur significant additional costs in continuing to comply with such regulations, VPC, LLC shall advise Owner of any increase in costs resulting therefrom, in which event the charges shall be adjusted to compensate VPC, LLC. for such increased costs. In such event of increased cost of such regulations or compliance therewith, Owner will be given the option to accept such charges or to terminate the foregoing Agreement. Should such be the case, VPC, LLC shall be entitled to receive payment for all work performed to date and all costs, expenses and overhead related to the project, otherwise, each party hereto shall be discharged of any further liability hereunder.

**19. INDEMNIFICAITON.** Owner shall defend, indemnify, and hold harmless for any injury or damage to VPC, LLC. caused by errors or omissions of surveyors, inspectors, non-associated contractors or subcontractors, individuals designated by the Owner to act on Owners behalf on any phase within the Agreement, or other third parties. Owner shall indemnify, defend, and hold VPC, LLC. harmless against all any and all claims of injury or damages brought by Owners surveyors, inspectors, or other individuals/companies designated by Owner to perform work on the property upon which VPC, LLC. is constructing a structure or building.

**20. BAILMENTS & STORAGE.** In the event any items of Owner are placed in a storage location so that construction of the structure as contemplated by this Agreement may be accomplished, Owner authorizes VPC, LLC. to place items in storage at the premises as needed for the completion of the construction. Such relocation, if deemed necessary, is performed as a courtesy to the Owner to mitigate damage to personal property in the construction process and is neither intended to create a situation of bailment nor a bailor-bailee relationship between the parties to this agreement.

**21. VENUE.** This Agreement is entered into in Watauga County, North Carolina, and shall be construed in accordance with the laws of the State of North Carolina. The parties hereby agree that Watauga County, North Carolina is an appropriate venue for the resolution of any disputes arising as a result of this contract.

**22. ARBITRATION.** In the event a dispute arises under this Agreement, Owner and VPC, LLC may agree in writing to arbitrate the dispute in an arbitration proceeding or submit to some other form of alternative dispute resolution, including but not limited to a pre-litigation mediation.

**23. ASSIGNMENT.** Owner may not assign, directly or indirectly, all or part of its rights or obligations under this Agreement except by mutual agreement and with written consent of all parties to this Agreement.

**24. INTEGRATION.** This agreement represents the entire and integrated agreement of the parties and supersedes all prior negotiations, representations or agreements, either written or oral. This agreement may only be amended by a written document duly executed by all parties. If any provision of this contract is unenforceable, invalid, or illegal, the remaining provisions will continue in full force and effect. The parties agree that both Owner and VPC, LLC have had the opportunity to review and have had input into the terms and conditions of this contract, and that such terms reflect the agreement of the parties including the price term set forth. As a result of the integrated terms of this Agreement, including the cost of construction, both parties agree that this contract shall not be construed against either party as draftsman.

**25. PORTFOLIO.** Owner agrees that VPC, LLC may take pictures of the property and structure as constructed by VPC, LLC during construction and upon the conclusion of the work for the purposes of marketing and as part of the portfolio of work performed by VPC, LLC. All such pictures and reproductions shall be the sole property of VPC, LLC and may be used by VPC, LLC, its successors or assigns, for such purposes as it deems appropriate without compensation to the Owner. Owner also agrees that, following the completion of construction, that VPC, LLC may leave its signage in place upon the property for a period of three months following the completion of the work unless such signage is prohibited by local zoning ordinances.

I confirm that my action here represents my electronic signature and is binding.

| | |
|---|---|
| Signature | Walter D. Phan |
| Print Name: | Walter D Phan |
| Date: | 2/1/2019 |

# EXHIBIT B

J. Drew Wilkie, P.E.
ENGINEERING

May 14, 2024

241 J. Morgan Street
Forest City, NC
28043

AnnaDell and Walter Pharr
c/o Brett M. Becker
Maynard Nexsen, P.C.
800 Green Valley Road, Suite 500
Greensboro, NC 27408

**Re:** **Pharr Residence – Report of Construction Deficiencies**
146 Big Rock Road, Banner Elk, NC 28604
Project No.: 06800123

Dear Mr. Becker:

In response to your request, I conducted an evaluation of building conditions at the Pharr residence in order to determine the extent of construction deficiencies and provide recommendations for corrective action. This report was prepared as a supplement to my January 24, 2024 report.

## Description

The subject structure is a wood-framed house with an attached garage. The exterior walls are finished with a combination of cement board siding and wood siding. The roof is covered with prefinished metal roof panels. For orientation purposes, the front of the house is designated as facing south.

## Background

The Pharrs entered into a contract with VPC Builders, LLC on April 10, 2018 to design a home for construction on their property. The Pharrs later entered into a fixed sum contract with VPC, LLC for construction of a house on February 1, 2019. VPC Builders, LLC and VPC, LLC are referred to here as VPC. VPC obtained a certificate of occupancy for the house on September 1, 2020. The Pharrs discovered problems with water intrusion occurring inside the house, observations of which led to concerns about construction deficiencies and structural damage. The Pharrs and VPC entered into a tolling agreement on June 13, 2023. The Pharrs, through counsel, hired J. Drew Wilkie, P.E. to evaluate the building in response to their concerns about water intrusion and deficiencies in the original construction of the house.

During initial evaluations of water intrusion that preceded my work, I understand that two freeze-induced ruptures were discovered where the water supply system connects to exterior wall-mounted spigots. The affected spigots are located on the north and south sides at basement level. Despite the repair of those ruptures having included drying efforts and a finding of no further plumbing leaks, wet conditions have continued to manifest within the basement wall assemblies.

**Client-Provided Documents**

I reviewed documents provided by the client, including the following:

A. Design contract between VPC Builders, LLC and the Pharrs, dated April 10, 2018
B. Construction contract, titled "Your Proposal," executed February 1, 2019
C. Plan set, titled "Rocky Knob Summit The Pharrs," prepared by Patrick A. Beville, PE of Ioncon, PLLC, dated November 20, 2018, 11 sheets
D. Report by American Leak Detection, dated May 8, 2023
E. Letter from State Farm Insurance Companies, regarding claim number 33-49B3-71C, dated May 11, 2024
F. Letter from Pharrs to VPC, dated June 13, 2023
G. Tolling agreement between the Pharrs and VPC, dated June 13, 2023
H. Photo Report by Sasser Restoration, dated December 7, 2023
I. Certificate of Occupancy #020200239, dated September 1, 2020, by Watauga County Planning and Inspections

**Research**

Additional documents reviewed as part of my evaluation include the following:

A. North Carolina Residential Code, 2018
B. Artisan Siding with Lock Joint System Single Family Installation Requirements
C. Technical Data Sheet for James Hardie Artisan Siding with Lock Joint System
D. ESR-2290 for James Hardie Artisan Lap Siding
E. Zip System Sheathing and Tape Installation
F. Jobsite Poster for Zip System
G. ESR-1474 for Zip System Wall Sheathing
H. ESR-2227 for Zip System Flashing Tape
I. ESR-4597 for Zip System Liquid Flash
J. Zip System Sheathing Fastener Frequently Asked Questions
K. TechNote: Reducing Moisture Risk in Frame Walls
L. Spray Foam: Open Cell vs. Closed Cell, published by Johns Manville
M. Vapor Retarder Classification, published by U.S. Department of Energy
N. Sierra Pacific Windows Installation Instructions
O. Watauga County inspections and permit records for the subject property

J. Drew Wilkie, P.E.
ENGINEERING

**Destructive Testing**

Following my initial visit to the property on August 25, 2023, and based on building conditions that were documented during that visit, I recommended destructive testing be performed to evaluate the extent of construction deficiencies and resulting damage to the building. Subsequent visits to the property were performed on February 13 and March 25, 2023. Additional attendees of the March 25 destructive testing included Sasser Restoration, Jody Harrington, and a representative of VPC.

Locations of destructive testing, performed on March 25, 2023, are marked below.




Locations of Destructive Testing, DT-1 through DT-6, marked on plans by Ioncon, PLLC

J. Drew Wilkie, P.E.
ENGINEERING

The following observations were made during site visits and destructive testing that took place on March 25, 2024.



*1. South elevation*



*2. South elevation*



*3. South and east elevations*



*4. West elevation of main house; garage*



*5. North elevation*



*6. East and north elevations*

*DT-1: West-facing wall near basement level*

Cement board siding was removed from the exterior wood-framed wall, exposing the Zip System sheathing and the interface between the frame assembly and foundation. This location was selected because of water intrusion and wet conditions that persisted inside exterior wall cavities months after my initial visit. (Photos 7 through 20)

DT1.1: The siding is identified as an interlocking cement board product, manufactured by James Hardie, known as Artisan siding with lock joint system.

DT1.2: The siding measures approximately 5/8-inch thick, 10-1/4-inches tall.
DT1.3: The siding exhibits a horizontal recess in its surface that is described as a square channel.
DT1.4: No flashing material exists at the base of the siding, where the wood-framed wall meets the foundation.
DT1.5: A heavy fillet bead of sealant exists along the intersection of the base of siding and the face of the foundation wall.
DT1.6: A thin layer of hardcoat stucco, that includes expanded metal lath, exists on the foundation wall below the wood-framed wall.
DT1.7: The expanded metal lath is not fully covered by the stucco.
DT1.8: A thickened edge of stucco along the bottom edge of siding indicates the stucco was applied after the siding.
DT1.9: The lack of stucco coverage over expanded metal lath behind the downspout indicates a downspout was installed before stucco was applied.
DT1.10: The Artisan siding is fastened primarily with 6d siding nails that measure approximately 2 inches in length, installed at vertical studs, approximately 16 inches apart. Some siding fasteners consisted of finish nails.
DT1.11: The fastening of the siding is in a blind-nailed configuration, where 6d siding nails are attached along the top flange of each piece of siding.
DT1.12: Outside corners of siding pieces meet along a miter joint that is painted over, but is not sealed or mechanically connected.
DT1.13: Water marks exist on the rear face of the siding.
DT1.14: Siding nails exhibit corrosion.
DT1.15: The Zip sheathing, originally manufactured to 7/16-inch thickness, measures 3/4-inches thick, exhibits obvious swelling, softness under hand pressure, and feels wet to the touch.
DT1.16: Sheathing nails are overdriven, measuring the nail heads as deep as ¼-inch below the face of sheathing.
DT1.17: The facing material on the Zip sheathing, which performs a water-resistive function, exhibits cracking and debonding from the wet and swollen oriented strand board (OSB) substrate.
DT1.18: Zip sheathing exhibits elevated moisture conditions that range from being damp to being saturated.
DT1.19: Portions of the Zip sheathing exhibit decomposition.
DT1.20: Water, held between the siding and sheathing, was observed dripping down the face of the sheathing as siding was being removed.
DT1.21: Localized wood rot was observed within wall framing members.
DT1.22: Wall cavity insulation consists of open-cell foam that is wet to the touch where the foam meets the exterior sheathing.



*7. DT-1: Siding removed from west wall*



*8. DT-1: Back of siding*



*9. DT-1: Outside corner prior to siding removal*



*10. DT-1: bowed siding at floor/ceiling levels*



*11. DT-1: wet and swollen sheathing*



*12. DT-1: overdriven sheathing nails*



*13. DT-1: siding fastened at 16" o.c.*



*14. DT-1: overdriven sheathing nails*

J. Drew Wilkie, P.E.
ENGINEERING


15. DT-1: sheathing removal


16. DT-1: back of sheathing


17. DT-1: outside corner condition


18. DT-1: stucco and caulking against siding


19. DT-1: water seeping from behind siding


20. DT-1: location of DT-1

*DT-2: West-facing wall at roof/wall intersection*

A roof-wall intersection exists where the west-facing wall of the main house meets the eave of the garage wing. This location was selected for evaluation because initial observations found deficiencies in the roof/wall flashings, combined with water intrusion that was visible inside the underlying wall assembly. Wet conditions persisted here months after my initial visit. (Photos 21 through 34)

DT2.1: The arrangement of flashing materials at the roof/wall intersection does not include a proper kickout flashing.
DT2.2: The gutter is in contact with the adjacent wall.

DT2.3: The position of flashings, roof panels, and other materials direct water against the wall of the main house.
DT2.4: Wet and deteriorated wall sheathing was found several inches beneath the roof/wall intersection.
DT2.5: Wall sheathing exhibits swelling. Measurements indicate sheathing has swollen to a thickness of ¾-inch (originally 7/16") where sheathing exhibits wet conditions.
DT2.6: Facing material on the Zip sheathing exhibits debonding from the OSB substrate, and cracking of the facing material is visible when viewed closely.
DT2.7: Sheathing nails are overdriven, with nail head positioned well below the face of sheathing.
DT2.8: Wall cavity insulation consists of open-cell foam.



*21. DT-2: roof/wall intersection: west wall*



*22. DT-2: stains below roof/wall intersection*



*23. DT-2: gutter removed*



*24. DT-2: roof/wall intersection*



25. DT-1 and DT-2



26. DT-2: Defective kickout flashing



27. DT-2: Wet and deteriorated sheathing below



28. DT-2: Water stains on back of siding



29. DT-2: holes bored in sheathing at r/w intx



30. DT-2: cracked and debonded facing on sheathing



31. DT-2: rotted sheathing; cracked facing




32. DT-2: open-cell foam insulation



33. DT-2: Bored hole cut in sheathing - swollen    34. DT-2: 6d siding nail

*DT-3: South-facing wall at a bedroom window*
This area was selected for destructive testing because the siding exhibits obvious outward bowing above the window, and because water intrusion and persistent wet conditions exist inside the wall cavity. (Photos 35 through 56)

DT3.1: Wood framing products are positioned against below-grade concrete, separated from below grade materials by segments of prefinished coil stock. The coil stock is positioned in a reverse-lapped fashion on the face of the wall sheathing; nailed in place without Zip sheathing tape.
DT3.2: Water intermittently dripped out from between the Zip sheathing and siding as siding was being removed.
DT3.3: Portions of Zip sheathing felt wet to the touch and appeared swollen and partially decomposed.
DT3.4: 6-mil polyethylene sheeting was used as a butt joint flashing for the siding. The polyethylene is nailed to the face of the Zip sheathing, without Zip sheathing tape.
DT3.5: Butt joint flashings were mechanically attached at their top edge, but the shape of the lower portion of the flashing droops (and drains) into the wall assembly; behind the siding.
DT3.6: Hardcoat stucco exhibits exposed expanded metal lath and thin coverage of lath, where applied to the adjacent foundation wall.
DT3.5: Siding protrudes outward at floor level, between the basement and main level, producing a bowed appearance.
DT3.6: Artisan siding is attached using 6d siding nails, in a blind-nailed configuration.
DT3.7: Window heads are missing a proper flashing system. Window heads are sealed shut.
DT3.8: The sill flashing of the window is taped shut. An outer layer of tape is covering the bottom layer of sill flashing tape. Tape flashing covers the entire length of the bottom nailing fin. When the tape was partially removed at one end, water began dripping out and down the face of the sheathing below.
DT3.9: The windows are manufactured by Sierra Pacific Windows.
DT3.10: Window flashing tape products exhibit reverse lapping conditions at the

jamb/sill intersection and jamb/head intersection.
DT3.11: Window fasteners and sheathing fasteners exhibit corrosion.
DT3.12: Framed wall cavities are filled with open-cell foam insulation.
DT3.13: Wall framing members exhibit localized wood rot where wet conditions exist near the base of the wall.


*35. DT-3: Location on south elevation*


*36. DT-3: intersection of siding and fdn wall*


*37. DT-3: reverse-lapped flashings 38.*


*DT-3: siding bowed at floor/ceiling levels*


*39. DT-3: head flashings sealed shut*


*40. DT-3: defective flashing at siding ends*



41. DT-3: flashing drains behind siding



42. DT-3: window head flashing



43. DT-3: head flashing sealed shut



44. DT-3: window flashing reverse-lapped




45. DT-3: sill flange of window taped shut



46. DT-3: Window fastener heavily corroded



47. DT-3: siding and trim removed



48. DT-3: sheathing nails overdriven/corroded



49. DT-3: corroded fasteners; open-cell foam



50. DT-3: open-cell foam insulation



51. DT-3: OD fastener; wet sheathing



52. DT-3: wet/deteriorated wood



53. DT-3: Swollen/deteriorated sheathing



54. DT-3: swollen/deteriorated sheathing



55. DT-3: rotted studs/sheathing



56. DT-3: location of DT-3

*DT-4: Southwest corner of the attached garage*
Destructive testing in this area was selected to investigate the cause of water intrusion and visible accumulation of water within the wall cavity, where water stains and wet conditions persist inside the garage (Photos 57 through 74)

DT4.1: Duct tape is located along the base of the exterior siding, extending downward below the lowest course of siding. Upon removal of siding, the duct tape product is identified as extending along the full length of the base of the wall.
DT4.2: A heavy application of sealant exists along the intersection of the foundation wall and Zip sheathing.
DT4.3: The Zip sheathing is wet to the touch and exhibits swelling, measuring ¾-inch thick; and labeled as 7/16-inch thick.
DT4.4: The facing material on the Zip sheathing (green) exhibits cracks and delamination from the underlying OSB substrate. The facing material moves under hand pressure and peels away from the substrate.
DT4.5: Localized wood rot exists within the Zip sheathing.
DT4.6: End joints (miter) are not sealed, and no corner flashing is present.
DT4.7: Sheathing nails (6d) exhibit overdriven conditions and corrosion.
DT4.8: Several sheathing nail locations have sealant applied to fill the fastener hole. The sealant appears identical in color and texture to the sealant that exists along the sheathing/foundation wall intersection.
DT4.9: Hardcoat stucco that includes expanded metal lath is applied to the foundation wall. Exposed metal lath and thinly covered metal lath were observed.
DT4.10:



*57. DT-4 location*



*58. DT-4 location*



59. DT-4: duct tape applied to sheathing



60. Sheathing sealed to fdn b/h tape



61. DT-4: sealant at bottom edge of sheathing



62. DT-4: sealant; overdriven fasteners



63. DT-4: cracked/delaminated facing



64. DT-4: cracked facing; sheathing wet



65. DT-4: West window sill flange taped shut



66. DT-4: siding nailed 16" o.c.; duct tape present



67. DT-4: duct tape; nail hole repairs present



68. DT-4: repair to OD fastener



69. DT-4: lower siding planks removed before



70. Sheathing wet; insulation wet



71. DT-4: rotted framing and sheathing



72. Face rot on wood framing



73. DT-4 comparison of swollen sheathing



74. DT-4: Rotted sheathing; corroded nails

J. Drew Wilkie, P.E.
ENGINEERING

*DT-5: Wood-framed chase*

The hardcoat stucco was removed from a portion of the wood-framed chase to further evaluate deficiencies that were visible at the base of the stucco and along unfinished edges. (Photos 75 through 86)

DT5.1: The wood-framed chase is comprised of wood framing, Zip sheathing, and hardcoat stucco.
DT5.2: Hardcoat stucco is missing flashings and weep screeds throughout the observed areas.
DT5.3: Hardcoat stucco exhibits exposed metal lath and thinly covered metal lath.
DT5.4: Hardcoat stucco thickness measured approximately 1/8-inch to ¼-inch.
DT5.5: Stucco is positioned less than one inch from ground level (finished slab).
DT5.6: Zip sheathing is positioned within 1/8-inch from ground level.
DT5.7: No stucco accessories were observed along the edges and corners of hardcoat stucco.
DT5.8: A reverse-lapped condition exists where the roof meets the wood-framed chase.
DT5.9: Stucco is applied directly to metal roofing components without separation or stucco accessories.
DT5.10: Zip sheathing was left exposed in the eave of the wood-framed chase.
DT5.11: No base wall flashings are present behind the vertical wood siding that abuts the wood-framed chase.
DT5.12: The base of vertical wood siding is situated at or below the finished slab in some locations.



*75. DT-5: location*



*76. DT-5: location*



77. DT-5: location



78. DT-5: stucco in contact with roofing; exposed lath



79. DT-5: exposed sheathing under eave



80. Reverse-lapped flashing and WRB on roof



81. DT-5: stucco and reverse-lapped flashings



82. DT-5: stucco at ground level



83. DT-5: flashing, weep screed omitted



84. DT-5: stucco too thin; sheathing on ground




85. DT-5: stucco too thin

86. DT-5: location

*DT-6: Intersection of concrete steps and garage wall*

This location was selected to evaluate the interaction between cast in place concrete steps that were constructed against a below-grade wood-framed wall, near where interior water intrusion has occurred in the garage. (Photos 87 through 94)

DT6.1: The siding on the garage wall exhibits water marks and a swollen appearance where the base of the siding is close to the concrete steps.
DT6.2: Cast-in-place concrete steps are constructed against the wall of the garage; the wood framing of the garage wall is below grade.
DT6.3: Siding on the garage wall is positioned within 1/8-inch of the concrete steps.
DT6.4: The base of siding includes no visible flashing out onto the steps.
DT6.5: The end joints of siding (miter) are not sealed. A vertical segment of coil stock is positioned behind the outer corner of siding.
DT6.6: Behind the siding and cast-in-place concrete steps, segments of coil stock are positioned between the steps and the Zip sheathing.
DT6.7: Some of the coil stock is taped to the Zip sheathing with duct tape.
DT6.8: The wood-framed wall (below-grade) cavity contains open-cell foam insulation.




87. DT-6: location

88. DT-6: deformed siding on steps to garage entry



89. DT-6: wood-framed wall below grade




90. DT-6: siding on steps; improper flashing



91. DT-6: siding on steps



92. DT-6: duct tape applied as flashing



93. DT-6: wood-framed wall cavity



94. DT-6: open-cell foam insulation below grade

**Weather Information**

Weather conditions during the March 25, 2024 destructive testing were partly cloudy and breezy, with no rainfall. Weather data that was collected from a private weather station located approximately one-half mile west of the Pharr residence indicates approximately 0.62 inches of rainfall was recorded on March 23, 2024, and that approximately 0.17 inches of rainfall was recorded in the prior week.

**Relevant Sections of the Building Code**

During my evaluation of construction deficiencies at the Pharr residence, I reviewed the North Carolina Residential Code, 2018 edition, to correlate my findings with specific requirements contained within the Code. Several code sections that are relevant to my observations and conclusions are quoted below in *italics.*

*R301.1 – Climate zones*
*Climate zones from Figure R301.1 or Table R301.1 shall be used in determining the applicable requirements from Chapter 4.*

*Figure R301.1 – North Carolina Climate Zones*
*Watauga County is identified graphically as part of climate zone 5A.*

*R301.2 – Climatic and geographic design criteria*
*Buildings shall be constructed in accordance with the provisions of this code as limited by the provisions of this section. Additional criteria shall be established by the local jurisdiction and set forth in Table R301.2(1).*

*Table R301.2(1) – Climatic and geographic design criteria*
*Refers to Tables R301.2(4) and R301.2(5) for wind speed design criteria.*

*Table R301.2(4) – Ultimate design wind speeds by county (mph)*
*Identifies Watauga County as a "special mountain region."*

*Table R301.2(5) – Ultimate design wind speed for mountain regions*
*Assigns an ultimate design wind speed of 150 mph for elevations greater than 4,500 feet.*

*R301.2.1.1 – Wind limitations and wind design*
*Construction in regions where the ultimate wind speeds from Tables R301.2(4) and R301.2(5) equal or exceed 130 miles per hour shall be designed in accordance with one of the following:*

1. *AF&PA Wood Frame Construction Manual (WFCM)*
2. *ICC Standard for Residential Construction in High-Wind Regions (ICC 600).*
3. *ASCE Minimum Design Loads for Buildings and Other Structures (ASCE 7).*
4. *Deleted.*

5. *International Building Code.*
6. *Concrete construction shall be designed in accordance with the provisions of this code.*
7. *Structural insulated panel (SIP) walls shall be designed in accordance with the provisions of this code.*
8. *Chapters 45 and 46.*

*R317.1 Location required*
*Protection of wood and wood-based products from decay shall be provided in the following locations by the use of naturally durable wood or wood that is preservative-treated in accordance with AWPA U1 for the species, product, preservative and end use. Preservatives shall be listed in Section 4 of AWPA U1.*

1. *Wood joists or the bottom of a wood structural floor when closer than 18 inches or wood girders when closer than 12 inches to the exposed ground in crawl spaces or unexcavated area located within the periphery of the building foundation.*
2. *Wood framing members that rest on concrete or masonry exterior foundation walls.*
3. *Sills and sleepers on concrete or masonry unless the slab that is in direct contact with the ground is separated from the ground by an impervious moisture barrier.*
4. *The ends of wood girders entering exterior masonry or concrete walls having clearances of less than ½-inch on tops, sides, and ends.*
5. *Wood siding and sheathing on the exterior of a building having a clearance of less than 6 inches from the ground.*
6. *Wood structural members supporting moisture-permeable floors or roofs that are exposed to the weather, such as concrete or masonry slabs, unless separated from such floors or roofs by an impervious moisture barrier.*
7. *Wood furring strips or other wood framing members attached directly to the interior of exterior masonry walls or concrete walls below grade except where an approved vapor retarder is applied between the wall and the furring strips or framing members.*
8. *All portions of a porch, screen porch or deck from the bottom of the header down, including posts, guardrails, pickets, steps, and floor structure. Coverings that would prevent moisture or water accumulation on the surface or at joints between members are allowed.*

*R317.1.2 Ground contact*
*All wood in contact with the ground, embedded in concrete in direct contact with the ground or embedded in concrete exposed to the weather that supports permanent structures intended for human occupancy shall be approved pressure-preservative-treated wood suitable for ground contact use, except that untreated wood used entirely below groundwater level or continuously submerged in fresh water shall not be required to be pressure-preservative treated.*

*R702.7 – Vapor retarders*
*Class I or II vapor retarders are required on the interior side of frame walls in Climate Zones 5, 6, 7, 8, and Marine 4.*

*Exceptions:*

1. *Basement walls.*
2. *Below-grade portion of any wall.*
3. *Construction where moisture or its freezing will not damage the materials.*

*Table R702.1(1) Thickness of plaster*
*Finished thicknesses required for various plaster bases are presented in tabular form, with expanded metal lath shown to correspond with a minimum cement plaster thickness of 5/8-inch. A note clarifies that where the thickness is measured from the back plane of the expanded metal lath, the plaster thickness shall be ¾-inch thick, as a minimum.*

*R702.7.1 – Class III vapor retarders*
*Class III vapor retarders shall be permitted where any one of the conditions in Table R702.7.1 is met.*

*Table R702.7.1 – Class III Vapor Retarders*
*Conditions for allowed use of Class III vapor retarders in Climate Zone 5 are stated in the table as follows:*

*Vented cladding over wood structural panels.*
*Vented cladding over fiberboard*
*Vented cladding over gypsum*
*Continuous insulation with R-value greater than or equal to 5 over 2x4 wall*
*Continuous insulation with R-value greater than 7.5 over 2x6 wall*

*R702.7.2: - Material vapor retarder class*
*The vapor retarder class shall be based on the manufacturer's certified testing or a tested assembly. The following shall be deemed to meet the class specified:*

*Class I: Sheet polyethylene, unperforated aluminum foil.*
*Class II: Kraft-faced fiberglass batts.*
*Class III: Latex or enamel paint.*

*R703.1.1 – Water resistance*
*The exterior wall envelope shall be designed and constructed in a manner that prevents the accumulation of water within the wall assembly by providing a water-resistive barrier behind the exterior veneer as required by Section R703.2 and a means of draining to the exterior water that enters the assembly.*

*R703.2 – Water-resistive barrier*
*One layer of No. 15 asphalt felt, free from holes and breaks, complying with ASTM D226 for Type 1 felt or other approved water-resistive barrier shall be applied over studs or sheathing of all exterior walls. Such felt or material shall be applied horizontally, with the upper layer lapped over the lower layer not less than 2 inches. Where joints occur, felt shall be lapped not less than 6 inches. The felt or other approved material shall be*

*continuous to the top of walls and terminated at penetrations and building appendages in a manner to meet the requirements of the exterior wall envelope as described in Section R703.1.*

*R703.4 – Flashing*
*Approved corrosion-resistant flashing shall be applied shingle-fashion in a manner to prevent entry of water into the wall cavity or penetration of water to the building structural framing components. ...The flashing shall extend to the surface of the exterior wall finish. Aluminum flashing shall not be used in contact with cementitious material except at counter flashing. Approved corrosion-resistant flashings shall be installed at the following locations:*

1. *Exterior window and door openings. Flashing at exterior window and door openings shall extend to the surface of the exterior wall finish or to the water-resistive barrier complying with Section 703.2 for subsequent drainage. Mechanically attached flexible flashings shall comply with AAMA 712. Flashing at exterior window and door openings shall be installed in accordance with one or more of the following:*
   - 1.1 *The fenestration manufacturer's installation and flashing instructions, or for applications not addressed in the fenestration manufacturer's instructions, in accordance with the flashing manufacturer's instructions. Where flashing instructions or details are not provided, pan flashing shall be installed at the sill of exterior widow and door openings. Pan flashing shall be sealed or sloped in such a manner as to direct water to the surface of the exterior wall finish or to the water-resistive barrier for subsequent drainage. Openings using pan flashing shall incorporate flashing or protection at the head and sides.*
   - 1.2 *In accordance with the flashing design or method of a registered design professional.*
   - 1.3 *In accordance with other approved methods.*
2. *At the intersection of chimneys or other masonry construction with frame or stucco walls, with projecting lips on both sides under stucco copings.*
3. *Under and at the ends of masonry, wood or metal copings and sills.*
4. *Continuously above all projecting wood trim.*
5. *Where exterior porches, decks, or stairs attach to a wall or floor assembly of wood-frame construction.*
6. *At wall and roof intersections.*
7. *At built-in gutters.*

*R703.7 – Exterior plaster*
*Installation of these materials shall be in compliance with ASTM C926, ASTM C1063 and the provisions of this code.*

*R703.7.1 – Lath*
*Lath and lath attachments shall be of corrosion-resistance materials. Expanded metal or woven wire lath shall be attached with 1-1/2-inch long, 11 gage nails having a 7/16-inch head, or 7/8-inch long, 16 gage staples, spaced not more than 6 inches or as otherwise approved.*

*R703.7.2 – Plaster*
*Plastering with Portland cement plaster shall be not less than three coats where applied over metal lath or wire lath and shall be not less than two coats where applied over masonry, concrete, pressure-preservative-treated wood or decay-resistant wood as specified in Section R317.1 or gypsum backing. If the plaster surface is completely covered by veneer or other facing material or is completely concealed, plaster application need be only two coats, provided the total thickness is as set forth in Table R702.1(1).*

*On wood-frame construction with an on-grade floor slab system, exterior plaster shall be applied to cover, but not extend below, lath, paper and screed.*

*The proportion of aggregate to cementitious materials shall be as set forth in Table R702.1(3).*

*R703.7.2.1 – Weep screeds*
*A minimum 0.019-inch, corrosion-resistant weep screed or plastic weep screed, with a minimum vertical attachment flange of 3-1/2 inches shall be provided at or below the foundation plate line on exterior stud walls in accordance with ASTM C926. The weep screed shall be placed not less than 4 inches above the earth or 2 inches above paved areas and shall be of a type that will allow trapped water to drain to the exterior of the building. The weather-resistant barrier shall lap the attachment flange. The exterior lath shall cover and terminate on the attachment flange of the weep screed.*

*R703.7.3 – Water-resistive barriers*
*Water-resistive barriers shall be installed as required in Section R703.2 and, where applied over wood-based sheathing, shall include a water-resistive vapor permeable barrier with a performance at least equivalent to two layers of Grade D paper. The individual layers shall be installed independently such that each layer provides a separate continuous plane and any flashing (installed in accordance with Section R703.4) intended to drain to the water-resistive barrier is directed between the layers.*
*Exception: Where the water-resistive barrier that is applied over wood-based sheathing has a water resistance equal to or greater than that of 60-minute Grade D paper and is separated from the stucco by an intervening, substantially nonwatery-absorbing layer or designed drainage space.*

*R703.10.2 – Lap siding*
*Fiber-cement lap siding having a maximum width of 12 inches shall comply with the requirements of ASTM C1186, Type A, minimum Grade II or ISO 8336, Category A, minimum Class 2. Lap siding shall be lapped a minimum of 1-1/4 inches and lap siding*

*not having tongue-and-groove end joints shall have the ends protected with caulking, covered with an H-section joint cover, located over a strip of flashing, or shall be designed to comply with Section R703.1. Lap siding courses shall be installed with the fastener heads exposed or concealed, in accordance with Table R703.3(1) or approved manufacturer's instructions.*

**Conclusions**

Based on my observations, experience, education, training, and research, I submit the following conclusions for your consideration. The Pharr residence suffers from water and moisture intrusion that was caused by numerous construction deficiencies, including deviations from the North Carolina Residential Code. Deficiencies in the construction of the Pharr residence caused functional damage, including rot and degradation of the building's structural components. The observed construction deficiencies are widespread, and require corrective action.

The primary mode of failure in construction of the building envelope at the Pharr residence is that the builder did not provide code-required and manufacturer-required flashings and clearances to allow for water and moisture to be directed and drained away from the building structure. Locations of omitted and deficient flashings and clearances were further compromised by the builder installing materials that served to impede drainage of the building envelope at key locations where flashings and clearances are necessary. For example, at the base of the wood-framed walls, where the builder omitted required flashing components, hardcoat stucco and sealants were applied below the wood-framed wall in a manner and position that effectively dammed the base of the building envelope shut and kept the building envelope from draining water and moisture out from behind the exterior cladding. A second example is that while the builder did install head flashing materials along the top of windows, the builder then filled the flashing with sealant in a way that dammed the flashing shut, preventing the flashing from operating as intended.

The following deficiencies were confirmed through on-site observations, destructive testing, and document review. Some of the code sections that relate to these conclusions are identified by section number. Alphabetical references correspond with documents that are listed in the Research section of this report. These references are provided to aid the reader in understanding the basis of these conclusions.

*Exterior Siding – James Hardie Artisan Siding with Lock Joint System*

1. Flashing and clearance requirements for installation of James Hardie Artisan Siding with Lock Joint System were not followed by the builder. The lack of appropriate flashings and clearances represents a deviation from the code and from the manufacturer's installation instructions. (NCRC R703.1.1; NCRC R703.4; B: page 2)

2. Siding was installed using a method of attachment that is known as blind nailing, where the fasteners are applied along the top flange of each siding course; and the top flange of siding is then covered by a subsequent course of siding that conceals the fasteners from view on the finished surface. Blind nailing of 10-1/4-inch James Hardie Artisan siding directly through Zip sheathing and into the studs, using 6d nails at 16 inches on center represents a deviation from code requirements because this method of attachment is not compatible with wind-specific requirements for this product and this property that dictate a different manner of installation. The manufacturer's technical data sheet provides several acceptable attachment alternatives, but the constructed configuration fails to meet code requirements because blind nailing of 10-1/4-inch Artisan siding, at 16-inches on center, directly onto Zip system sheathing does not provide wind speed performance necessary for the property's 150 mph rating. Other methods of attachment that do provide an appropriate level of performance were available, but the constructed configuration of Artisan siding failed to meet the requirements of the code and the manufacturer. (NCRC R301.2; NCRC R301.2(1); NCRC R301.2(4); NCRC R301.2(5); C: pages 9-13)

*Zip System Exterior Sheathing*

3. Installation of Zip system sheathing failed to meet code requirements and the manufacturer's installation instructions. Deficiencies in sheathing installation include: improper fastening; lack of correction of deficient fastening; reverse-lapping of Zip system tape; omission of Zip system tape; improper substitution of duct tape instead of Zip system tape; and improper application of liquid sealants. Wet conditions, swelling of sheathing panels, general degradation of sheathing panels, and wood rot were observed in locations where deficiencies in Zip system sheathing exist. (NCRC R703.1.1; NCRC R703.2; NCRC R703.4; NCRC R703.7.3; E: pages 25-54; F; G; H; I)

*Windows*

4. Windows were installed using a system of rough opening flashing and window flashing that contradicts manufacturer's instructions, placing flashing tape in reverse-lapped positions, and directly causing water to accumulate within the defective flashing assembly. The heads of windows are sealed shut, contradicting published and accepted requirements for proper flashing; and negating the effectiveness of underlying flashing materials. The sill flanges of windows are taped shut, obstructing drainage of the rough opening. Rotted sheathing and framing were found directly below defective window flashing conditions. (NCRC R703.1.1; NCRC R703.4; NCRC R703.7.3; B; E; N)

*Roof/Wall Intersections*

5. A defective system of flashing was used at the intersection of roofs and walls. The lack of a proper kickout flashing caused water intrusion and functional damage to the wood-framed wall. (NCRC R703.4; B: page 2)

*Below-Grade Wood-Framed Wall*

6. A layout and assembly error exists in the garage wing. The wood-framed garage wall that abuts the garage entry steps is shown on the plans as having a foundation wall that extends to an elevation above the concrete entry steps, but the omission of a foundation wall in this area resulted in the construction of a defective system of wood wall framing that is below grade; constructed of materials that are not intended for below-grade construction. The construction of cast-in-place concrete steps placed the wood-framed garage wall in a below-grade condition that deviates from code requirements and makes the wall susceptible to degradation. (NCRC R317.1; NCRC R317.1.2; NCRC R703.4)

*Thermal Insulation*

7. Exterior wood-framed wall cavities at the Pharr residence are insulated with a spray-applied expanding foam product. Two primary types of spray-applied foam are used as thermal insulation in building construction: open-cell foam and closed-cell foam. The cavities of the wood-framed walls at the Pharr residence are insulated with open-cell foam. Open-cell foam insulation is an allowed material for wall insulation only when used in conjunction with a Class I or Class II vapor retarder. Open-cell foam insulation is water-permeable and vapor permeable; and code requirements for its use include a Class I or Class II vapor retarder on the interior side of framed walls. The construction of open-cell foam insulated wall cavities at the Pharr residence omitted the required Class I and Class II vapor retarder, and instead relied on materials that qualify as a Class III vapor retarder. Damaged wall framing and sheathing exist in areas where this defect in insulation occurred. (NCRC R301.1; NCRC Figure R301.1; NCRC R301.2; NCRC R702.7; NCRC R702.7.1; Table R702.7.1; NCRC R702.7.2; K; L; M)

8. There are other types of wall insulation and integrated products that could have been used in a code-compliant manner; or the construction of the wall could have simply included the required Class I or II vapor retarder. This defect is causing moisture to accumulate within the wall assembly, which has resulted in functional damage to the sheathing and framing.

*Hardcoat Stucco*

9. Hardcoat stucco that is applied to the foundation walls and the wood-framed chimney chase exhibits numerous deficiencies that violate the Code. The stucco is applied too thin, with incomplete coverage of the expanded metal lath, without proper flashings, and without proper accessories. (NCRC R703.1.1; NCRC R703.2; NCRC R703.4; NCRC R703.7; NCRC R703.7.1; NCRC R703.7.2; NCRC R703.7.2.1; NCRC R703.7.3; E; F)

*Previous Plumbing Ruptures*

10. Throughout my evaluation, I considered the extent to which the previously-repaired plumbing ruptures (spigots) contributed to water intrusion and resulting damage. In closely and manually observing the locations of the two plumbing ruptures, I found those ruptures and their effects to be separate from the construction deficiencies and water intrusion that are the subject of this evaluation. The effects of the plumbing ruptures are localized, while the construction deficiencies are widespread.

The above-listed items represent deviations from manufacturers' installation requirements, conventional construction practice, and the North Carolina Residential Code. Functional damage to structural building components has already occurred as a result of these construction deficiencies. Because there is existing damage, and as a result of my experience evaluating this type of damage, I expect additional damage to be uncovered beyond areas where destructive testing has been performed. This conclusion is based on the existence of so many construction deficiencies that are widespread in their locations on the building, and the combined negative effect of having multiple construction deficiencies involving water and moisture resistance within multiple layers of the building envelope.

**Corrective Action**

Deficiencies in the design and construction of the Pharr residence caused water intrusion, moisture intrusion, and resulting damage to the structural components of the building. Corrective action is needed: 1) to bring the building into compliance with the requirements of the North Carolina Residential Code; 2) to limit further water intrusion for the purpose of preventing physical damage to the building structure; and 3) to correct damage that has occurred. I recommend the following items be included in a scope of repair to correct construction deficiencies and resulting damage.

*Exterior Siding*

1. Remove and replace all exterior siding, to include installation of new water-resistive barriers, flashings, sealants, and finish coatings. This applies to cement board siding and wood siding.

*Stucco*

2. Remove and replace all stucco cladding on the wood-framed chimney chase and foundation walls.

*Windows*

3. Remove and reinstall all windows.

*Exterior Sheathing*

4. Remove and replace up to two courses of exterior sheathing, starting at the base of the wood-framed exterior walls. This item is to include installation of new flashings, weather-resistive barrier, and other components and other needed accessories. Localized sheathing repairs, in addition to the bottom two courses, should be anticipated as being needed at the perimeter of rough openings.

*Exterior Wall Framing*

5. Make localized repairs to sister or replace rotted wall frame members that were damaged by water and moisture intrusion.

*Exterior Wall Cavities*

6. Remove and replace painted interior wall finishes that are applied to exterior walls.
7. Remove and dispose open-cell foam insulation from exterior wall cavities.
8. Complete a survey of exterior wall sheathing to aid in determining the extent of sheathing repairs that are to be performed.
9. Install cavity insulation in exterior walls.

*Below-Grade Wood-Framed Wall*

10. Install temporary shoring and bracing for the ceiling and roof of the garage wing adjacent to the garage entry door.
11. Remove the existing wood-framed wall from its position as a below-grade wall along the west side of the garage entry steps.
12. Remove and replace the existing garage entry steps that are positioned against the below-grade wood-framed wall.
13. Design, form, and pour a cast-in-place concrete foundation wall between the garage and garage steps in order to extend the foundation wall to its intended exterior elevation that approximately matches that of the garage entry door threshold and adjacent slab.
14. Construct a wood-framed wall atop the newly constructed foundation wall, in place of the original below-grade wood-framed wall.

*Consideration for Complete Reclad*

15. Repairs to correct the deficiencies and resulting damage to the Pharr residence consist of a complete reclad of exterior walls with localized sheathing replacement and localized framing repairs. During my evaluation, I considered whether the construction deficiencies and resulting damage could be corrected without removing all of the exterior cladding, but the combination of installation deficiencies, deviations from the North Carolina Residential Code, and underlying damage to the building structure make it impractical to correct this combination of construction deficiencies without removing all of the exterior cladding. Removal of interior finishes is driven by the omission of a vapor that should have been placed between the painted gypsum wallboard and the face of the wood-framed wall assembly.

J. Drew Wilkie, P.E.
ENGINEERING

*Consideration for Associated Repairs and Refinishing*

16. Because this evaluation is focused on the building envelope, there are items of finishes, fixtures, and other systems that will be affected by the repair activities. Though not enumerated here, provisions for associated repairs should be included in the scope of repair.

Repairs should be performed by a licensed general contractor, in accordance with the North Carolina Residential Code, and in accordance with all local building requirements. If additional deficiencies are identified during repairs, then these findings should be amended accordingly.

**Closure**

This report has been prepared in accordance with the applicable professional standard of care. No other warranties or guarantees, express or implied, are made or intended. This report has been prepared solely for Anna Dell and Walter Pharr and Maynard Nexsen, P.C. for the purpose stated herein and should not be relied upon by any other party or for any other purpose. Conclusions in this report are based on the limited investigation described above. This report may be supplemented as additional information becomes available.

Please contact me at (704) 996-3969 if you have questions or need additional information.

Very truly yours,

J. Drew Wilkie, P.E., REWC

NORTH CAROLINA PROFESSIONAL SEAL 028416 ENGINEER J. DREW WILKIE

J. Drew Wilkie Registered Exterior Wall Consultant RCI 0037 RCI, Inc.